**WINN–DIXIE STORES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 14533.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 11, 1970.

Decided Sept. 27, 1971.

Charles F. Henley, Jr., Jacksonville, Fla. (Otto R. T. Bowden, and Hamilton & Bowden, Jacksonville, Fla., on brief), for petitioner.

Michael F. Messitte, Atty. N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Eugene B. Granof, Atty., N. L. R. B., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

Winn-Dixie Stores, Inc., (hereafter "Company"), asks this court to set aside, in part, an order of the National Labor Relations Board (hereafter "Board") based upon the finding that the Company had interfered with its employees' right to organize, that it had discriminatorily discharged certain employees, and that the strike which commenced on November 10, 1968, against the Company was an unfair labor practice strike. National Labor Relations Act, § 8(a) (1) and (3) as amended 29 U.S.C.A. § 158(a) (1) and (3). The Board, in turn, has cross-petitioned for enforcement of its order.

I

In the spring of 1968, many of the Company's warehousemen and truckdrivers at its Hialeah, Florida, facility discussed among themselves their dissatisfaction with conditions of their employment. These discussions led to a meeting in April 1968 which was attended by numerous employees and during which they presented their grievances to a few company officials, including Service Superintendent Lunetta. The results of this meeting were less than satisfying to the employees and they accordingly sought the assistance of a union.[1] After organizing efforts, the Union won Board-conducted "representation elections," i. e., the right to represent the employees of the Company, in separate units[2] of truckdrivers and warehousemen, on June 28, 1968, and August 2, 1968, respectively. Collective bargaining negotiations then commenced between the Union and the Company.

There were six prestrike meetings between company and union representatives for the purpose of negotiating a contract; the meetings were not successful.[3] On *Sunday*, November 10, 1968, the employees who were members of the Union met and voted to strike, assertedly against the wishes of union officials present. That same day the striking employees appeared at a company warehouse with *printed* picket signs; these signs and the Union's handbills which ap-

---

1. Freight Drivers, Warehousemen and Helpers, Local Union 390, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

2. The existence of two separate bargaining units has no bearing on the issues be-

fore this court; consequently, no distinction will be drawn between the warehouse unit and the driver unit.

3. The Trial Examiner found that "Bargaining negotiations up to November 10 proved abortive. * * * "

peared later, reflected only economic grievances against the Company.[4] At no time did the Union change or alter its picket signs or its handbills to indicate that the walkout was an unfair labor practice strike.

Since there was no contract with an established grievance procedure in effect prior to the strike, the Union and the Company had discussed and attempted to resolve employee grievances during their negotiation meetings.[5] The Union alleges that the discharge of eight employees prior to and subsequent to the time when it became the collective bargaining agent was the main factor underlying the strike on November 10, 1968.[6] During the six negotiation meetings held prior to the strike the Union's representatives did not attempt to discuss with the Company the discharge of any one of these eight employees.[7] Subsequent to the commencement of the strike the Company and the Union held three more meetings during which the Union did not mention the discharges of these eight employees.

Nearly a month after the commencement of the strike the Union filed charges against the Company with no allegation that the strike was caused by the discharges of employees. The Union did charge that the Company had fired a number of employees discriminatorily and had interfered with the employees' right of self-organization in violation of §§ 8(a) (3) and (1) of the Act. On May 26, 1969, two weeks prior to the hearing before the Trial Examiner and approximately seven months after the strike, the Union caused its complaint to be amended to include an allegation that the walkout was an unfair labor practice strike.

The Trial Examiner found that the strike was an unfair labor practice strike prompted in large measure by the unlawful discharges of Leonize Jones, Willie Hightower and Joseph Gause. He dismissed, as without merit, five of the eight charges of discriminatory discharge, including the charges that S. Melton and Darnell Gause had been fired unlawfully. Subsequently, the Board in its order affirmed the Trial Examiner's decision as to the cause of the strike and as to the discharges of Leonize Jones, Joseph Gause and Willie Hightower, but overruled him with respect to the releases of S. Melton and Darnell Gause, finding that they also had been discriminatorily discharged. Appellant now challenges the Board's order with respect to its holding that the strike was an unfair labor practice strike and that the discharges of S. Melton and Darnell Gause were discriminatory and in violation of the Act.

## II

■ This court's jurisdiction of these proceedings is invoked under § 10(e) and (f) of the Act, since it appears that the Company transacts business within this judicial circuit albeit the happenings and events involved herein occurred in another circuit. Olin Industries, etc. v. National Labor Relations Board, 191 F. 2d 613 (5 Cir. 1951), n. 1, reh. den.

---

4. The Union's first handbill read in pertinent part:
   Winn-Dixie has refused to negotiate a fair contract which will improve the employees' wages, hours and working conditions. Winn-Dixie employees in Miami, Florida are on strike to protest this unfairness.

5. Testimony of company representatives at the hearing established this fact and the Union and its counsel did not attempt to refute it.

6. The Union maintained originally that the Company had discharged twenty-two

employees because of their activity on behalf of the Union; the Regional Director for the Board issued a complaint against the Company alleging the discriminatory discharge of only eight in violation of § 8(a) (3) of the Act. Five of these employees particularly in issue, S. Melton, Darnell Gause, Willie Hightower, Leonize Jones and Joseph Gause, were fired in 1968 on July 9, August 13, October 1, October 31, and November 5, respectively.

7. Employees testified to this effect before the Trial Examiner.

192 F.2d 799, cert. denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332, reh. den. 343 U.S. 970, 72 S.Ct. 1055, 96 L.Ed. 1365.

## III

The role of this court in this proceeding is clear. While it is generally the province of the Board to ascertain the facts, pass on the credibility of witnesses, and resolve conflicts in the testimony, this court may set aside those findings if they are not supported by substantial evidence on the record as a whole. The Supreme Court noted in Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that:

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." 340 U.S. at 488, 71 S.Ct. at 465.

## IV

The Company has not challenged the Board's findings of violations of two sections of the Act, § 8(a) (1) by threatening employees with discharge and § 8(a) (3) and (1) by discharging Hightower, Jones and Joseph Gause. However, for such conduct to invest a strike with the label of an unfair labor practice strike the conduct must be shown by substantial evidence to have had a causal connection with the strike. Winter Garden Citrus Pr. Co-Op. v. National Lab. Rel. Bd., 238 F.2d 128, 129 (5 Cir. 1956); National Labor Relations Bd. v. James Thompson & Co., 208 F.2d 743, 746 (2 Cir. 1953). Upon the whole record we conclude that the Board's finding that the strike beginning on November 10, 1968, was caused, at least in part, by unfair labor practices is not supported by substantial evidence.

The Board's finding concerning the nature of the strike was bottomed upon the testimony, before the Trial Examiner, of four employees, Jones, Wiggins, Hightower and Joseph Gause. They testified that the employees had discussed the discharges of several of their leaders [8] during their prestrike union meeting on November 10 and had voted to strike at the conclusion of this meeting since they feared further discharges to the extent that there would be no one left to negotiate on their behalf. Their testimony indicated that the decision to strike was made against the advice and wishes of union officials present at the meeting and that the walkout was a spontaneous occurrence. This testimony is suspect since shortly after this decision to strike, on a Sunday morning, the striking employees appeared at a Company facility with *printed* picket signs. Nevertheless, the Board relied upon this self-serving [9] testimony and held that it constituted sufficient evidence of a causal connection between the Company's unfair labor practices and the strike.

There is substantial and persuasive evidence to the contrary. Union representatives did not mention the discharges during any of the nine negotiation meetings, not even during the three meetings following the strike. The Union did not indicate or suggest on its picket signs or in its handbills that the strike was to protest unfair labor practices. The Union did not claim that this was an unfair labor practice strike in its initial complaint against the Company, approximately one month after the beginning of the strike; indeed, the Union did not make this charge until two weeks prior to the hearing before the Trial Examiner, more than six months after the commencement of the strike. It is clearly apparent that the Union was attempting to salvage an unsuccessful economic

---

8. It appears from the record that J. Gause, Hightower and Jones were considered to be among the leaders of the employees in the Union.

9. Three of the four employees giving this testimony had been fired prior to the strike.

strike with this belated charge. The only evidence indicating that the strike was in protest of unfair labor practices was the testimony of the four employees whose interested status is indisputably obvious.

Such testimony has been held incredible under similar circumstances. Filler Products, Inc. v. N. L. R. B., 376 F.2d 369 (4 Cir. 1967). Cf. National Labor Relations Bd. v. West Coast Casket Co., 205 F.2d 902 (9 Cir. 1953).[10] In *Filler Products* this court reviewed an order of the Board based upon the testimony of several employees, given many months after the strike there involved, to the effect that it was an unfair labor practice strike. The union in that case even referred in its placards to the walkout as a "strike because of Unfair Labor Practices"; nevertheless, the employees' testimony was deemed insufficient in light of existent circumstances to show a causal connection between unfair labor practices and the strike.

■ We conclude that the evidence in this case is insufficient to show a causal connection between unfair labor practices and the strike. Attributing to the testimony of the employees such probative force as it intrinsically commands but taking into account all that detracts from it and relating this testimony to the evidence as a whole, it appears that the statements of the four employees were so highly improbable as to warrant the conclusion of incredibility. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). Consequently, the Board's finding that the strikers should be reinstated is without substantial support in the record and must be set aside.[11]

V

■ In finding that Darnell Gause and Melton had been improperly discharged the Board overruled the findings of the Trial Examiner who was not completely satisfied with the reasons assigned by the Company for discharging the two men but felt there was insufficient proof that the discharges were motivated by antiunion animus since the union activities of the dischargees were minimal.[12] The Board can overrule the Trial Examiner, even on findings of fact, but the Examiner's decision is part of the record which must be considered when determining whether the substantial evidence on the record as a whole supports the findings of the Board. Universal Camera Corp. v. N. L. R. B., *supra*.[13] It is in this light that we consider

10. In the *West Coast Casket* case an employee testified that the union members had gone on strike, in part to protest the unlawful discharge of a fellow worker, but the discharge in issue was not mentioned in the Union's literature printed during the strike and it was not discussed at the last meeting between union and company representatives before the strike. The Ninth Circuit found the employees' testimony to constitute substantial evidence of a connection between the unlawful discharge and the strike notwithstanding the evidence to the contrary. The *West Coast Casket* case is distinguishable from the one at bar. In the instant case the unfair labor practices were not mentioned by the Union in three meetings after the commencement of the strike; the Union failed to allege an unfair labor practice strike in their initial complaint against the Company and finally did so by amending the complaint some six months after the beginning of the strike. The union in the *West Coast Casket* case

charged that the strike was an unfair labor practice strike in the initial complaint to the Board, less than two weeks after the beginning of that strike.

11. Where a strike is purely economic and unrelated to any employer unfair labor practices, the employer need not discharge permanent replacements to make way for returning strikers; the strikers must wait until vacancies arise. N.L.R.B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 344–347, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); see *generally*, N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

12. The Board admitted that Melton and Darnell Gause, in particular, were not openly active on behalf of the Union.

13. The Court noted in pertinent part that: We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial examiner who has observed the witness-

the legality of the discharges of Darnell Gause and Melton.

Darnell Gause was fired on August 13, 1968, after being late to work on two consecutive working days, August 10 and August 12. He claimed to have been stopped and delayed each day by police enforcement of a "curfew" in the area in which he lived.[14] On August 12, a Company dispatcher called the home of Gause when the latter did not come to work by the appointed time. Apparently Gause informed the dispatcher that he would report for work later in the day; Gause had not even begun the trip to work.[15] The Company also ascertained that other employees living in the area of the "curfew" had not been late to work on either August 10 or August 12. Gause admitted that he knew a route by which he could have avoided the delay occasioned by the police and that he did not use it. He had received several reprimands prior to this incident for being late to work, had been suspended from work for three days for the same offense and had been reprimanded on another occasion for failing to take important material to Key West, Florida, on one of his delivery trips. Two of the above reprimands occurred within two months of Gause's discharge and were marked "final," which indicated that any necessity for further reprimands would result

in his discharge. Consequently, Gause was discharged following the incident of August 12.

The Board found that Darnell Gause's discharge, at least in part,[16] was due to the Company's belief that he was active in the Union even though Gause had never worn his union button to work or overtly expressed his support of the Union. The Board's finding was premised on three points; first, Darnell Gause's brother, Joseph, was a Union steward and a known leader of the Union; second, Darnell Gause had been accused on one occasion by a company official of discussing the Union with other employees; and third, a company official had allegedly told an employee that the Company intended "to fire the old guys one by one." [17] The Board could not fairly conclude that the Company fired Darnell Gause because the Company might have suspected that he, like his brother, was an ardent supporter of the Union; this conclusion is purely speculative and unsupported by the record. Company official, Don Lunetta, who had reprimanded Darnell Gause early in August 1968 for discussing the Union with employees at a particular warehouse, discovered at that time that he had confused Darnell with Joseph Gause, and tendered an apology.[18] The Trial Examiner noted

es and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. 340 U.S. at 496, 71 S.Ct. at 469.

14. The record shows that there was a police enforced curfew in effect in the area of Darnell Gause's home on both August 10 and 12.

15. Vincent Yucaitis, the company supervisor with authority over Gause, testified that the dispatcher had told him of the conversation with Darnell Gause. After this point was raised at the hearing by the Company, Gause attempted to explain the incident. When he initially testified he stated that he could not remember whether or not the dispatcher had called *him*. After Yucaitis had

testified Darnell Gause tried to explain that his brother, who did not testify, had answered the phone in their home when the dispatcher had called. The dispatcher did not testify.

16. If a discriminatory motive was at least a factor causing the discharge of an employee, he was discharged unlawfully. Winchester Spinning Corp. v. N.L.R.B., 402 F.2d 299 (4 Cir. 1969).

17. There was testimony in the record that Lunetta had expressed the Company's intention "to fire the old guys * * * one by one because if we fire more than one it would cause a strike." Presumably this statement referred to the "old guys" who supported the Union and was credited by the Trial Examiner though Lunetta denied making it.

18. Darnell Gause testified before the Examiner that Lunetta confused him with

the circumstances surrounding this incident and was unpersuaded; we agree that there is no substantial support for an inference that the Company considered Darnell Gause to be an active union supporter. The Company later reprimanded Darnell Gause on August 6, 1968, for "talking to other employees" when he should have been working; he was not accused of discussing the Union on this occasion. The Board speculatively inferred that Gause was reprimanded on that occasion because the Company believed that he had been verbally supporting the Union and further inferred that he was fired partly as a result of this incident. It is commonplace for firms to reprimand employees for talking when they should be working. This reasoning concerning the incident of August 6 premises an inference upon an inference and is clearly untenable. Also, the Board inferred from a statement, supposedly attributable to Don Lunetta, to the effect that he intended "to fire the old guys one by one" (if they were union supporters) that, since Gause was an "old guy," he had been fired as a union supporter. If the stamp of approval were to be placed on the Board's position and reasoning in this instance any employee of some tenure who had signed a union card would be immune from disciplinary action by the Company.

■■ It is true as emphasized by the Board that the Company has demonstrated an inclination [19] in years past to disregard the statutory rights of its employees; this is relevant evidence.[20] However, this court has held that it takes more than proof of an employer's general antiunion policy to support a finding that an individual discharge was in violation of § 8(a) (1) and (3) of the Act; company knowledge of the union activity of the discharged employee must be *shown* by direct or circumstantial evidence. N. L. R. B. v. Overnite Transportation Company, 308 F.2d 284 (4 Cir. 1962). We do not find substantial evidence, circumstantial or direct, in the record to support the inference drawn by the Board that Darnell Gause was released as a result of his union activity.

■ Melton had worked in the Company's Hialeah warehouse for over four years prior to his discharge on July 9, 1968. He had been promoted from laborer to "set down man" in June 1968. Company officials, including Richard Schortmeier, testified before the Examiner that Melton's performance as a laborer was excellent but that his work as a "set down man," though good at first, deteriorated rapidly soon thereafter. Schortmeier, a shipping clerk with supervisory responsibility over some employees in the area in which Melton worked, stated that employees complained to him on several occasions that Melton was talking too much to some of the laborers and thus interfering with their work. Schortmeier reported these complaints to his superior, Gary Basile, who was also the direct superior of Melton. Basile, in his testimony before the Examiner, related that he had received complaints from Schortmeier concerning Melton, that he had consulted with Melton concerning these complaints and encouraged him to improve his performance but to no avail. On July 9, 1968, Basile received yet another complaint from Schortmeier concerning Melton and felt obliged to release him [21] due to the continued complaints with respect to the

his brother Joseph, realized his mistake and apologized.

19. Since 1963 there have been five separate court decrees enforcing Board orders against the Company and the Company was once convicted under the Act for criminal contempt. In Re Winn-Dixie Stores, Inc., 386 F.2d 309 (5 Cir. 1967).

20. Maphis Chapman Corp. v. N.L.R.B., 368 F.2d 298, 303–304 (4 Cir. 1966).

21. Basile testified that there was a company policy against demoting a man if he could not adequately perform in his new job after a promotion; such an employee was to be released, as was Melton. The Union did not attempt to rebut this testimony.

inadequacy of his job performance and the poor conditions existent in Melton's work area which tended to corroborate these complaints. Joe Gordon, *an hourly employee* and the "set down man" on the night shift, testified that Melton frequently failed to perform his duties properly, leaving an inordinate amount of empty slots for Gordon to fill when he came on duty at the end of Melton's shift. He further testified that Melton's performance was inferior to that of the other set down men he had observed in his nearly eleven years of employment with the Company.

The Examiner found that, while the Company's reasons for discharging Melton were somewhat suspect, his discharge was lawful since there was insufficient evidence to establish company knowledge of Melton's union activity.[22] We agree that there was insufficient evidence to show company knowledge of Melton's union activity.

The Board conceded that Melton, according to his own statements before the Examiner, never passed out union cards while at work, never talked about the Union on the job, never wore a union button to work though numerous other employees did so, and was never questioned by any company official concerning his involvement in the Union. The Board, nevertheless, found that the Company was cognizant of or at least suspected Melton's union activities due to one short statement he made during the initial employee grievance meeting with company officials in April 1968 prior to the advent of the Union. While Melton had arranged for the meeting to be held in the church which he attended there was no evidence that the Company was ever aware of this fact. The Board inferred that Melton's brief and insignificant remarks at this meeting, attended by more than one hundred employees, caused the Company to believe that he was a leader of the employees in preunion days and further inferred that the Company was thus cognizant of or suspected Melton's work on behalf of the Union after its advent upon the scene.

The Board's reasoning is purely speculative on this record. Melton was not among the leaders of the employees at the April 1968 meeting at which grievances were considered; the testimony[23] of Leonize Jones buttresses this conclusion. Nor was Melton a member of the employees' committee[24] which conferred with company officials on the day following the grievance meeting. In any event, Melton's brief mention of a grievance during a meeting held *prior* to union contacts is not an adequate basis to support a conclusion that the Company was aware of or suspected union activity on the part of this employee.

The Board's assertion that the company complaint to the effect that Melton spent too much time conversing with other employees on the job indicated its awareness or suspicion of Melton's actions on behalf of the Union is, again, purely speculative. It is also noteworthy that other employees who were more openly active than Melton in their work for the Union, were not discharged.

The reasons advanced by the Board as supporting its conclusion that Melton was fired as a result of the Company's antiunion animus when considered singly, are extremely weak and unpersuasive; when considered in their entirety, the facts do not constitute substantial evidence to support the inferences drawn therefrom by the Board and its finding that Melton's discharge was in violation of the Act.

Enforcement granted in part and denied in part.

---

22. Melton signed a union card and testified that he solicited three other employees to do likewise, before his discharge.

23. Jones stated before the Trial Examiner that he and two other employees, Rutledge and Larkins, were the spokesmen for the employees at the meeting; that Melton presented only one minor grievance.

24. Jones also testified that he, Rutledge, Larkins and Hightower met the next day as an employees' committee with company officials.