A. David ABRAMS, Plaintiff,

v.

UNITED STATES of America,
Defendant and Third-Party
Plaintiff,

v.

Frank G. LEONFORTE and Julyn Sports-
wear, Inc., Third-Party Defendants.

Civ. Nos. 69–29 BK, 69–30 BK.

United States District Court,
S. D. West Virginia,
at Beckley.

Oct. 30, 1971.

See also D.C., 52 F.R.D. 578.

James C. Higgins, Beckley, W. Va., for plaintiff.

W. Warren Upton, U. S. Atty., Charleston, W. Va., for defendant and third-party plaintiff.

Harold D. Brewster, Jr., Bluefield, W. Va., Barley & Goode, Welch, W. Va., for third-party defendant, Frank G. Leonforte.

John T. Kay, Jr., Charleston, W. Va., for third-party defendant, Julyn Sportswear, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FIELD, Chief Judge.

These consolidated actions came before this Court on June 15 and 16, 1971, for trial without a jury. Now, upon consideration of the evidence and the arguments of counsel, the Court finds as follows:

### FINDINGS OF FACT

1. These consolidated actions[1] concern the trust fund portion of the employment taxes which were assessed against, but left unpaid by, two now-defunct West Virginia corporations, McDowell Fashions, Inc., and Mercer Fashions, Inc., as follows (Gov't. Exs. 384, 386–A, 386–B, 394, 395):

A. McDowell Fashions, Inc.—

| Quarter | Unpaid Balance | Trust Fund Portion |
|---|---|---|
| 4/1965 | $5,479.18 | $ 5,479.18 |
| 3/1966 | 9,626.61 | 6,942.43 |
| 4/1966 | 7,869.02 | 6,046.02 |
| 3/1967 | 8,599.63 | 6,565.12 |
| 4/1967 | 1,495.22 | 1,063.33 |
| | Total | $26,096.08 |

B. Mercer Fashions, Inc.—

| Quarter | Unpaid Balance | Trust Fund Portion |
|---|---|---|
| 4/1966 | $1,100.30 | $ 819.61 |
| 2/1967 | 797.40 | 608.50 |
| | Total | $1,428.11 |

2. The above-listed trust fund portions were assessed on February 16, 1968, as 100 percent penalties under Section 6672 of the 1954 Internal Revenue Code (26 U.S.C.) by the Commissioner of Internal Revenue against both plaintiff A. David Abrams and third-party defendant Frank G. Leonforte. (Gov't. Exs. 386–A, B, C, D; 387–A, B, C, D.)

3. On August 2, 1968, plaintiff Abrams paid $129.88 of the assessment relating to Mercer Fashions, Inc., and $346.78 of the assessment relating to McDowell Fashions, Inc. At the same time, he filed the appropriate claims for refund of both amounts and for abatement of the remaining assessments. The claims for refund were disallowed by letter dated March 10, 1969, and these actions followed on October 14, 1969. (Gov't. Exs. 386–D, 387–D; Compl. pars. 6th, 7th.)

4. In its answers, the defendant United States contested this Court's jurisdiction to consider plaintiff Abrams' claims for abatement and asserted counterclaims for the unpaid portions of the assessments. Simultaneously, the defendant United States joined Frank G. Leonforte as a third-party defendant, asserting that he too was a responsible officer who should be held liable for the trust fund portions of the unpaid employment taxes of the two corporations. Third-party defendant Leonforte's motions to dismiss these complaints as improper third-party practice were denied by Order dated December 8, 1970.

5. In the meantime, by Order dated July 17, 1970, this Court granted the United States leave to file a third-party complaint against Julyn Sportswear, Inc., a foreign corporation with its principal place of business in New York. Third-party defendant Julyn moved to vacate this Order and to dismiss the third-party complaint filed against it asserting *inter alia* that the complaint was not proper third-party practice, that a claim had not been stated upon which

---

1. These actions were consolidated for discovery and trial by Order entered February 17, 1970.

relief could be granted, and that Julyn lacked sufficient minimum contacts with West Virginia to be subject to service of process via the State's long-arm statute. The motion to vacate was denied by Memorandum Order entered May 21, 1971, and the motion to dismiss was denied by Order dated June 15, 1971.[1a]

6. By its third-party complaint, as amended, the United States asserts liability under Section 3505 of the 1954 Internal Revenue Code (26 U.S.C.) against third-party defendant Julyn for the trust fund portion of the employment taxes left unpaid by McDowell Fashions, Inc., for the third and fourth quarters of 1967. Demand for such monies. was made by letter dated July 1, 1970. (Gov't. Exs. 388–A, B, C, D.)

7. Third-party defendant Julyn did substantial and consistent business with McDowell Fashions, Inc., in West Virginia during 1967 in the form of labor contracts to be performed in West Virginia. At least 115 invoices for work completed were sent to Julyn by McDowell covering billings of not less than $102,897.33 during 1967. (Gov't. Exs. 55–243, Julyn Ex. 9.)

8. The issues raised by the parties may be summarized. as follows—

(a) Whether plaintiff Abrams was a "responsible officer" in either or both of the corporations; if so, whether he willfully failed to collect, truthfully account for, and pay over taxes required to be withheld from the salaries of the employees of the corporations.

(b) Whether third-party defendant Leonforte was a "responsible officer" in either or both of the corporations; if so, whether he willfully failed to collect, truthfully account for, and pay over taxes required to be withheld from the salaries of the employees of the corporations.

(c) Whether third-party defendant Julyn paid wages direct to the employees of McDowell; and whether it advanced funds for the payment of wages knowing the employment taxes could not or would not be paid.

9. McDowell Fashions, Inc. [hereinafter McDowell], was chartered by the State of West Virginia on November 20, 1964. (Gov't. Ex. 396.) McDowell was to be a labor contractor in the garment industry.[1b]

10. The original incorporators of McDowell were plaintiff Abrams [hereinafter Abrams], third-party defendant Leonforte [hereinafter Leonforte] and one Abe Cramer of Harrisburg, Pennsylvania. (Gov't. Ex. 396.)

11. McDowell was to commence business with 1,500 shares of issued capital stock at $1.00 par value, for a total of $1,500 in capital. The total authorized capital stock was $25,000.00. (Gov't. Ex. 396.)

12. Each of the three incorporators subscribed for 500 shares of stock. (Gov't. Ex. 396.)

13. The only incorporator who contributed any capital to McDowell was Abe Cramer who provided $8,300.

14. Abrams was the president of McDowell and Leonforte the secretary-treasurer. (Gov't. Ex. 47.)

15. There were never any by-laws adopted or minutes kept. No formal board of directors' meetings were ever held and few, if any, records were kept on behalf of the corporation. The testimony indicated that an accountant re-

---

1a. Julyn is in the business of designing, manufacturing, and distributing female garments. Julyn Syndicates, Janine Fashions, Park East Fashions and Maternity Originals are wholly owned subsidiary corporations of Julyn, have the same business address as Julyn, and are in the same business as Julyn. Some of the garments, however, are designed and

cut in New York and shipped to sewing factories, some of which are owned by Julyn.

1b. During its existence from 1965 through September, 1967, McDowell's primary cost was labor, although it did have expenses for rent, machinery and equipment, supplies, utilities, etc.

tained by Abrams in Beckley kept some type of books of account on behalf of the corporation during the first few months of its existence. After the accountant resigned, the only records maintained by McDowell were bank statements, cancelled checks, invoices, and occasional notes. Most of these records have been lost or misplaced since the demise of the corporate form in 1967.

16. McDowell never issued any stock. Abe Cramer never received any stock for his contribution.

17. Abe Cramer's only involvement with McDowell was the contribution of $8,300, which he never recovered, and his agreement to appear as one of the incorporators. To that extent, Abe Cramer's involvement with McDowell stems from a friendship with Abrams.

18. Abrams and Leonforte met in 1964 at a sewing plant in Pennsylvania which Leonforte was then managing.

19. Subsequently, Abrams offered Leonforte the position of plant manager for McDowell at the same salary he was then making, $200 per week, plus an interest in the business. Leonforte accepted and, thereafter, made at least two trips to Charleston for the purpose of explaining to state officials how he intended to train applicants how to sew. The purpose of these trips was to secure a state-supported training program upon which to begin business.

20. By early 1965, McDowell opened its doors in a building bought and remodeled by the McDowell County Development and Improvement Corporation and leased to McDowell. The building is located in Kimball, West Virginia. The necessary machinery had been purchased on time.

21. The first quarter of 1965 McDowell did no business, its entire activities consisting of the operation of the first training program class.

22. The training program lasted three months, during which time the state paid McDowell a price per hour for each girl in training plus a propor-

tionate part of the rent and Leonforte's salary. Each girl was paid her transportation.

23. At the end of the three-month program, McDowell was required to give each girl who finished the training program an opportunity to work in the plant. If the girl could not do the work, then McDowell was free to fire her.

24. It appears from the testimony that McDowell ran three of these programs, but the second and third programs were conducted while McDowell began regular business activities with the girls who had completed the training program. Thus, in the second quarter of 1965, McDowell began regular business activities in one part of the plant while it started a second training program for a new group of applicants in another part of the plant.

25. As a labor contractor in the garment industry, McDowell would obtain orders for sewing precut garments or cut-and-sew orders from jobbers who supplied both the materials and the transportation. During the early months, McDowell obtained work from various jobbers, including Julyn.

26. Within the first few months of operation, Abe Cramer was advised by Abrams that McDowell needed a Small Business Investment Company loan of $15,000 and that Cramer would have to sign personally for the loan if he continued to be a one-third stockholder. At that point, Cramer simply threw up his hands and walked out, leaving his $8,300 behind.

27. Upon Cramer's departure, the stock ownership was adjusted to 45 percent for Cramer. Again, no stock was issued and there does not appear to be any written memoranda of the stock ownership adjustment.

28. Thereafter, the SBIC loan was obtained with Abrams and Leonforte both signing personally for the loan.

29. From the second quarter of 1965 through the second quarter of 1966, Mc-

Dowell's business appears to have increased steadily.

30. In April of 1966, Abrams and Leonforte opened a second labor contractor, Miss Amy Fashions, Inc. [hereinafter Miss Amy], this one in Beckley, West Virginia. (Gov't. Ex. 398.) [2]

31. Although the charter for Miss Amy provided for the commencement of business with $1,000 capital, no capital contributions were made by Abrams or Leonforte. No stock was ever issued; no by-laws adopted; no minutes kept; and no books of account maintained. Miss Amy began under a state-supported training program in the same manner as McDowell was started.

32. In the meantime, McDowell had been supplying work to the Abraham Lorber Company, a sole proprietorship.

33. On May 11, 1966, Lorber, Abrams and Leonforte incorporated the Abraham Lorber Company under the name of Mercer Fashions, Inc. [hereinafter Mercer]. (Gov't. Ex. 397.)

34. Lorber was to have half the stock and Abrams and Leonforte 25 percent each. No stock appears to have been issued. No by-laws were adopted; no minutes kept; and—after Lorber left a few months after incorporation—no books of account maintained.

35. Lorber contributed the business to the corporation, and Abrams and Leonforte contributed $100,[3] and agreed to secure enough business to keep the plant busy. At the time, Lorber's company owed McDowell about $1,500 in unpaid advances. (Leonforte Dep., p. 72.) [4]

36. About four months later, in early September, 1966, the International Ladies Garment Workers Union discovered that Julyn, a union shop, had been giving work to McDowell, a nonunion shop, which in turn supplied work to Mercer and Miss Amy, also nonunion shops. The union stopped the work at McDowell for about three weeks and demanded that all three plants unionize. (Gov't. Ex. 391.)

37. McDowell acceded to the union demands, but Miss Amy simply closed and Lorber refused to allow the union at Mercer. The situation at Mercer was resolved by McDowell buying out Lorber for about $1,500, which came as an advance from Julyn to McDowell.

38. Simultaneously, conferences were held with Internal Revenue Service personnel regarding McDowell's unpaid back employment taxes.[5] At this time, the Internal Revenue Service advised that, if Abrams and Leonforte wanted to keep the McDowell plant open, they would have to keep current on the employment taxes and make a $10,000 payment on the back taxes.

39. The first and second quarter employment taxes for 1966 had been paid, although depositary receipts had not been purchased.

40. On January 3, 1967, Abrams paid $10,000 toward McDowell's back taxes, which the Internal Revenue Service applied to the oldest accounts first, paying in full the second and third quarters of 1965 (both the employer's liability and the trust fund liability) and applying the remaining $155.82 on the account for the fourth quarter of 1965. (Gov't. Exs. 399, 400) Abrams had not directed how the funds were to be applied. He made the payment because he was afraid that the Internal Revenue Service would close the business down if a $10,000 payment on the back taxes was not made.

---

2. Although the unpaid employment tax liabilities of Miss Amy are not directly involved here, the facts surrounding the establishment and handling of Miss Amy are pertinent to a full understanding of the facts involved in this case.

3. It is not clear whether they each contributed $100 or whether the total contribution was $100.

4. Leonforte's entire deposition was admitted into evidence during the trial by Abrams without objection from any party.

5. Conferences were constantly being held by telephone or otherwise regarding McDowell's employment tax problems. Several different agreements were signed providing for periodic payments on the back taxes.

41. McDowell's employment taxes for the third and fourth quarter of 1966 were not paid and only sporadic payments were made under the payment agreements on the back taxes. (Gov't. Ex. 399)

42. Then, on April 12, 1967, before the due date for the first quarter, 1967, employment tax return, a conference was held with the Internal Revenue Service by Abrams and Leonforte. Leonard Rosenblatt, executive vice-president of Julyn, attended the conference on behalf of Julyn. Most of the dealings between Julyn and McDowell were conducted by Rosenblatt on behalf of Julyn. Rosenblatt died in 1971, subsequent to the institution of this action, but prior to trial.[5a]

43. Prior to the April 12, 1967, conference, Rosenblatt had been fully advised by Abrams of McDowell's financial situation, including the tax difficulties. (Gov't. Ex. 245.) Abrams requested Rosenblatt to attend the next conference with the Internal Revenue Service for the purpose of assuring it that Julyn and its subsidiaries would continue to supply work to McDowell so that it would have sufficient work to enable it to earn enough money to pay its current withholding taxes and to make payments on the back taxes.

44. At the April 12, 1967, conference, Abrams signed another payment agreement. (Gov't. Ex. 44.) In addition, Rosenblatt was asked to guarantee the payment of current employment taxes. He refused, but did say that he would see what he could do to make sure the taxes were paid. At that conference, the Internal Revenue Service was also advised that Julyn was going to be the primary, if not the exclusive, jobber of McDowell and that Julyn would be giving McDowell a steady supply of work. At that time, Rosenblatt, Abrams and Leonforte were advised by Internal Revenue Service personnel that McDowell would be allowed to stay open as long as there was no default on current taxes and payments were being made on delinquent taxes.

45. In the meantime, the Mercer plant had been closed and the girls working for Mercer had been moved to the balcony section of the McDowell plant. At this time, Mercer was in default on its fourth quarter, 1966, employment taxes. Abrams and Leonforte had intended to keep Mercer in operation as a separate entity until all Mercer bills had been paid off.

46. After the April, 1967, conference, Julyn saw to the payment of McDowell's employment taxes for the first two quarters of 1967. Earlier, Julyn had provided funds to McDowell for the payment of current first quarter, 1967, deposits of employment taxes. (Gov't. Exs. 392, 399.) The remainder of the first quarter, 1967, taxes was paid with money supplied by Julyn and delivered by Rosenblatt in the company of Abrams and Leonforte to the Internal Revenue Service. (Leonforte Dep., p. 44.) The second quarter, 1967, employment taxes of McDowell were paid by a McDowell check which was covered by a Julyn wire transfer of funds. (Julyn Ex. 4; Gov't. Exs. 247–D, 399.)

47. The employment taxes of Mercer were paid for the first quarter of 1967, but not for the second quarter. The second quarter of 1967 was the last quarter in which Mercer operated. It was not dissolved formally, however, until April 26, 1968, and then by decree.

48. On July 20, 1967, another payment agreement was executed by Abrams and Leonforte for the payment of McDowell's back taxes. (Gov't. Ex. 44.) At the time this agreement was executed, McDowell was in default on the employment taxes due for the fourth quarter of 1965 and for the third and fourth quarters of 1966. This new

5a. Rosenblatt was familiar with Leonforte since he had operated sewing factories in the past which had done work for Julyn. Rosenblatt knew that Leonforte possessed the skill necessary to operate a sewing factory which would produce garments of satisfactory quality for Julyn's needs.

agreement provided for the negotiation of a "new agreement" after October 15, 1967.

49. Julyn and its subsidiaries were the only jobbers sending work to McDowell during 1967, and Julyn made several advances to McDowell during the third quarter of 1967. (Julyn Ex. 4.)

50. At the end of the third quarter of 1967, McDowell defaulted on its employment taxes. When, however, the Internal Revenue Service arrived at the plant to padlock it, the plant was empty and closed up. McDowell ceased operations in October, 1967. It had been formally dissolved by decree on April 20, 1967.[5b]

51. Three weeks of wages had been paid to McDowell employees in October of 1967 for work performed in September, 1967. McDowell paid no employment taxes for the fourth quarter of 1967. Under Julyn's union contract it was required to see that all wages were paid to employees of its subcontractors if the latter failed to pay them.

52. Both McDowell and Mercer were operated as, and treated as, partnerships by Leonforte and Abrams. Neither business was ever completely converted into a bona fide corporation, although each business did hold a charter from the State of West Virginia at one time or another.

53. With respect to both corporations, Leonforte's role was that of a factory and sales manager for the businesses. He co-signed checks and was aware of the corporation's financial difficulties. Indeed, with refreshing candor, Leonforte admitted his responsibility while on the stand.

54. Leonforte and Abrams were in constant communication by telephone or in person. Leonforte advised Abrams of every financial problem and never made a financial decision without first consulting Abrams.

55. Leonforte did, however, participate in decisions as to which creditor should be paid. He was aware that the taxes were not being paid. He knew that they should have been paid, and he had sufficient control over the money to see that the taxes were paid.

56. With respect to both corporations, Abrams' role was that of financial organizer, overseer, and administrator. He co-signed checks and was aware of the corporation's financial difficulties.

57. Abrams participated in all financial decisions. He participated in decisions as to which creditor should be paid and even signed checks paying himself and his own companies while the taxes were in default. He was aware that the taxes were not being paid. He knew that they should have been paid, and he exercised more than enough control over the money to see that they were paid.

58. Abrams' attempt to shift the entire responsibility for the unpaid taxes to Leonforte is almost ludicrous. Abrams knew that Leonforte was not, and had never been, anything but extremely inept in financial matters. Leonforte's fortè is in the handling of the garments and the training of the girls who sew them. If, therefore, Abrams did specifically assign the responsibility for the taxes to Leonforte—a claim which this Court doubts—he should have known better.[6]

59. As a successful owner and manager of his own furniture store, Abrams knew what steps were necessary to assure the payment of the taxes. No such steps were taken.

---

**5b.** In the last week of September, 1967, McDowell notified Rosenblatt that the Internal Revenue Service would require a substantial lump sum payment on the back taxes in October, 1967, to permit McDowell to continue in operation. Julyn was requested to furnish funds to make such payment. Rosenblatt refused and also refused to send McDowell any further work. As a result of this, McDowell ceased operations and went out of business in the last week of September, 1967.

**6.** Having listened to Leonforte's consistent and candid testimony, this Court is inclined to believe him rather than the sometimes conflicting and often inconsistent testimony of Abrams.

60. Abrams had access to all records; was customarily sent a copy of every invoice; and, with the exception of requests for advances from jobbers, was generally the person with whom all financial matters were handled. (See, e. g., Gov't. Ex. 390, 391.) Checks were typed up by the bookkeeper, signed by Leonforte at the plant, and then mailed to Abrams at Beckley where he examined and signed them. (See Gov't. Exs. 45–47.) Sometimes Abrams mailed the checks from Beckley; at other times, he mailed them back to the plant for mailing.

61. Abrams and Leonforte jointly decided which creditors would be paid. During each of the tax periods involved here, they knowingly and intentionally preferred several creditors—including themselves—of both McDowell and Mercer over the United States. (Gov't. Exs. 49, 50–A–51–L, 53, 54, 253, 255–257, 259–279, 287–362, 385–A, 385–B.)

62. Although Abrams is certainly the more culpable of the two, both Abrams and Leonforte willfully failed to pay over to the Government the taxes for which they were under a duty to collect from the employees of both corporations and account for and pay over to the Government.

63. Both Abrams and Leonforte possessed both the power and the responsibility within the corporate structures to make sure that the withheld taxes were paid over to the Government. (See Gov't. Exs. 40–43.)

64. During the third quarter of 1967, Julyn advanced $62,275.00 to McDowell. (Julyn Exs. 1–4.) Of this amount, $12,150.00 was advanced for the specific purpose of paying McDowell's second quarter, 1967, taxes (Julyn Ex. 4, p. 3) and at least $44,700.00 was advanced for the specific purpose of paying wages. The third quarter contained six pay days covering twelve weeks. The amount of the net pay rolls and the date paid can be correlated with the advances as follows:

| Pay Day | Net Pay Roll | Gov't. Ex. No. | Advance Day | Amount | Julyn Ex. No. |
|---|---|---|---|---|---|
| 7–14–67 | $ 7,543.07 | 33 | 7–13–67 | $ 7,500.00 | 4, p. 1 |
| 7–28–67 | 5,685.95 | 34 | 7–27–67 | 6,000.00 | 4, p. 2 |
| 8–11–67 | 8,408.54 | 35 | 8–10–67 | 8,700.00 | 4, p. 5 |
| 8–25–67 | 8,202.82 | 36 | 8–24–67 | 8,500.00 | 4, p. 7 |
| 9–8–67 | 7,701.48 | 37 | 9–7–67 | 8,000.00 | 4, p. 8 |
| 9–22–67 | 5,672.21 | 38 | 9–21–67 | 6,000.00 | 4, p. 9 |
| Totals | $43,214.07 | | | $44,700.00 | |

The remaining $5,425.00 advanced by Julyn during the third quarter were on different days and in much smaller amounts. (Julyn Exs. 1–3, 4, pp. 4, 6.) There were bills other than employees wages paid during this period and presumably these amounts went to pay such bills.

64–A. During the third quarter of 1967, McDowell also made payments to the Internal Revenue Service to be applied on back taxes on the following dates, in the following amounts:

| DATE | AMOUNT |
|---|---|
| 8–14–67 | $1,200.00 |
| 8–31–67 | 375.00 |
| 9–14–67 | 375.00 |
| Total | $1,950.00 |

(Government Exhibit 12A)

65. The advances came from Julyn to McDowell primarily by wire transfer to the Bank of Iaeger at Iaeger, West Virginia, where McDowell kept its bank account during the latter part of 1967. The great majority of the checks written on that account were payroll checks. The amounts paid by Julyn for services rendered by McDowell were fair and reasonable in amount.

66. Each wire transfer came after a telephone conversation between Leonard Rosenblatt and Leonforte during which Leonforte would ask for money to pay wages. Leonforte would customarily raise his request a few hundred dollars in the hopes of getting money to pay creditors. Julyn, through Leonard

Rosenblatt, usually believed that it was advancing only net wages when it advanced the payroll because Leonforte usually did not tell Julyn he was adding on a few hundred dollars  All money paid to McDowell came from Julyn. The amounts owed to McDowell by Julyn's subsidiaries were netted against amounts paid by Julyn by unilateral inter-company adjustments to accounts.

67.  The advances made by Julyn to McDowell during the third quarter of 1967 were made with actual notice or knowledge that McDowell did not intend to, or would not be able to, make timely payment or deposit of the taxes required to be deducted and withheld from the wages of McDowell employees.

68.  Julyn had been dealing with McDowell long before the third quarter of 1967.  Julyn was advancing funds to McDowell when McDowell had its bank account with the First National Bank of Keystone, Keystone, West Virginia. (Gov't. Exs. 248–A–248–M, 246–A–246–P.).

69.  McDowell had seldom if ever made timely deposits of the employment taxes and was constantly in communication with the Internal Revenue Service regarding defaulted quarters.  In a letter he wrote as executive vice-president of Julyn, Leonard Rosenblatt demonstrated a full and complete knowledge of all of McDowell's financial problems.  (Gov't. Ex. 245.)  In addition, Rosenblatt attended a meeting which Abrams and Leonforte held with the Internal Revenue Service regarding McDowell's delinquent employment taxes.  This meeting occurred in 1967 during the first quarter.  At that meeting, the necessity for current payment of employment taxes by McDowell—if the plant were to remain open—was stressed.

70.  The sum of $11,175.00 represents 25 percent of the amounts which Julyn supplied to, or for the account of, McDowell for the specific purpose of paying employees' wages in the third quarter of 1967.

71.  The amount claimed by the Government against Julyn for the third quarter, 1967, is less than 25 percent of the amounts which Julyn supplied to, or for the account of, McDowell for the specific purpose of paying employees' wages in the third quarter of 1967.

72.  The last two pay days of McDowell fall in the fourth quarter of 1967 and consist of three weeks.  (Gov't. Exs. 5–A, 5–B, 39.)

73.  On each of the two fourth quarter, 1967, pay days, Julyn sent its secretary Samuel Bock to the McDowell plant with the net amount of the wages.  The first time Bock came, each employee signed the check given to her by McDowell and then turned that check over to Bock as a receipt for the cash amount of the check.  The second time, he simply paid the employees the net wages due pursuant to a list which the McDowell bookkeeper had compiled.

74.  The payments made by Julyn to the employees of McDowell during the fourth quarter, 1967, were wages paid directly to each such employee.

## CONCLUSIONS OF LAW

1.  Section 1346(a) (1) of the Judicial Code (28 U.S.C.) gives this Court jurisdiction over plaintiff Abrams' suits for refund; Section 1346(c) of the Judicial Code provides jurisdiction over the Government's counterclaims and Section 1340 of the Judicial Code grants jurisdiction over the Government's third-party complaints.

2.  Although this Court is of the opinion that Section 7421 of the 1954 Internal Revenue Code (26 U.S.C.) precludes jurisdiction over plaintiff Abrams' prayers for abatement, the Court's disposition of the Government's counterclaims both renders this jurisdictional issue moot and resolves the substantive issues raised by the prayers for abatement.

3.  This Court has jurisdiction over the person of Julyn Sportswear, Inc.

4.  Rule 4(e) of the Federal Rules of Civil Procedure permits the use of a state statute in a federal district court

to serve process on a person who neither resides within nor can be found in the State.

5. The West Virginia long-arm statute (W. Va. Code, Sec. 31–1–71) provides for service on an out-of-state corporation "if such corporation makes a contract to be performed, in whole or in part, by any party thereto, in this State".

6. Julyn is subject to service of process under the West Virginia long-arm statute since Julyn has such minimum contacts with the State of West Virginia so as to permit use of the long-arm statute without offending traditional notions of fair play and substantial justice. Whatever else may amount to "minimum contacts" under the existing case law, undoubtedly the performance of substantial and consistent business in the State during the very period involved in the suit constitutes more than the requisite "minimum contacts" necessary for the exercise of jurisdiction over a foreign corporation. See, generally, Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 239 F.2d 502 (C.A. 4, 1956); Hodge v. Sands Manufacturing Co., 151 W.Va. 133, 150 S.E.2d 793 (1966).

7. Federal law prevails over state law as to what constitutes a partnership or a corporation for federal tax purposes. Mertens, Law of Federal Income Taxation, Vol. 6, Sec. 35.02, Vol. 7, Sec. 38.02. Generally, however, a corporate form will not be lightly disregarded. Such action requires a thorough examination of all the facts and circumstances in an effort to determine if the "corporation" has an "independent personality". United States v. Klein, 139 F.Supp. 135 (S.D.N.Y.,1955), affirmed 247 F.2d 908 (C.A. 2, 1959). In this case, there was never any true corporate form created. But, the attempt to create a true corporate form being in no way for the purpose of tax avoidance, this Court will not go behind the apparent corporate structure in this case.[7]

8. The method by which the $10,000 payment made by Abrams was applied to McDowell's unpaid employment taxes by the Service was in conformity with the standards set forth in Revenue Ruling 58–239, 1958–1 Cum. Bull. 94. In the case of a clearly voluntary payment, a taxpayer obviously cannot complain after the fact about the way the funds were applied when he gave no instructions to the Service and the funds were applied in a generally acceptable manner. Here, there is even some doubt as to whether the $10,000 payment was voluntary. Even if instructions as to the application of funds had been given to the Service, no valid complaint could be made with respect to the application of funds which were involuntarily paid. O'Dell v. United States, 326 F.2d 451 (C.A. 10, 1964).[8] Indeed, the way in which the funds were applied (to both the employer's liability and to the trust fund liability) was rather generous in view of the fact that the Service could have applied all the funds to the employer's liability. The Service is entitled to apply collected funds to the corporate debts least likely to be collected. Liddon v. United States, 448 F.2d 509 (C.A. 5, August 17, 1971).

9. Section 6672 of the 1954 Internal Revenue Code (26 U.S.C.) imposes a pen-

---

7. This holding is in no way meant to preclude in any subsequent legal proceeding which may arise a finding that McDowell or Mercer constituted nothing more than partnerships under West Virginia law.

8. This Court has addressed itself to the merits of the misapplication of funds claim in the interest of equity. Nevertheless, there is some doubt as to whether this Court even has jurisdiction over this claim in view of the lateness with which it was raised. The issues were set forth in the Case Status Report approved by this Court December 8, 1970, and this particular claim was not raised.

alty equal to the unpaid trust funds on any responsible person who willfully fails to collect, truthfully account for, and pay over employment taxes.

10. Thus, Section 6672 provides a two-prong test: Is the individual involved responsible, that is, is he a person who is required to collect, truthfully account for, and pay over the taxes? And, was his failure to perform this duty willful?

11. Plaintiff Abrams has the burden of proving that, with respect to McDowell and Mercer, he was not a responsible officer who willfully failed to collect, truthfully account for and pay over the withholding taxes of the employees. Third-party defendant Leonforte has the burden of proving that, with respect to McDowell and Mercer, he was not a responsible officer who willfully failed to collect, truthfully account for, and pay over the withholding taxes of the employees.

12. To meet this burden of proof, Abrams and Leonforte must show that they were not responsible for the collection and payment of the taxes or that their failure to pay the funds over to the Government was not willful within the meaning of 26 U.S.C. Section 6672. United States v. Molitor, 337 F.2d 917 (C.A. 9, 1964).

13. Persons subject to liability under 26 U.S.C. Section 6672 are those individuals who have both the power and the responsibility within the corporate structure for assuring that taxes are withheld and properly paid over to the Government. Although corporate office alone does not create the statutory duty, it is not necessary to be the disbursing officer before a duty to collect and pay over attaches. The duty to collect, account for, and pay over taxes "is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursal of funds." Monday v. United States, 421 F.2d 1210, 1214 (C.A. 7, 1970) cert. denied 400 U.S. 821,

91 S.Ct. 38, 27 L.Ed.2d 48 (1970). Accord, Bloom v. United States, 272 F.2d 215 (C.A. 9, 1959), cert. denied, 363 U. S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960); Hewitt v. United States, 377 F.2d 921, 924 (C.A. 5, 1967); Scott v. United States, 354 F.2d 292, 173 Ct.Cl. 650 (1965). See 26 U.S.C. Section 6671 (b) for the definition of the term "person" as used in 26 U.S.C. Section 6672.

14. The fact that one corporate official is found to have the duty to collect, account for, and pay over the taxes, and to have willfully failed in this duty, in no way precludes the Court from finding the same duty in, and imposing the same liability on, another corporate officer. Monday v. United States, supra, 421 F.2d p. 1214; Liddon v. United States, supra, 512 of 448 F.2d.

15. Willful action under 26 U.S.C. Section 6672 means something other than accidental action. "One who acts intentionally, consciously and voluntarily, acts wilfully." Cross v. United States, 311 F.2d 90, 94 (C.A. 4, 1962), quoting Bloom v. United States, supra. See Liddon v. United States, supra, p. 513 of 448 F.2d. There need not be any intent to defraud or to deprive the Government of the taxes collected for the action to be willful. The knowing preference of other creditors over the Government is sufficient. Bloom v. United States, supra.

16. Plaintiff Abrams is a person who was required to collect, truthfully account for, and pay over the employment taxes of McDowell and of Mercer, and who willfully failed to account for and pay over such taxes, within the meaning of 26 U.S.C. Section 6672.

17. Third-party defendant Leonforte is a person who was required to collect, truthfully account for, and pay over the employment taxes of McDowell and of Mercer, and who willfully failed to account for and pay over such taxes, within the meaning of 26 U.S.C. Section 6672.

18. Section 3505(a) of the 1954 Internal Revenue Code (26 U.S.C.) imposes liability for unpaid employment

taxes (and interest) on any third party who pays wages directly to employees of an employer or to an agent of the employees.

19. Section 3505(b) of the 1954 Internal Revenue Code (26 U.S.C.) imposes liability for unpaid employment taxes (and interest) on any third party who advances funds for the specific purpose of paying wages with actual notice or knowledge that the employer either cannot or will not make timely payments or timely deposits of the withheld taxes. Liability under this subsection, however, is limited to 25 percent of the amount advanced for the purpose of paying the wages.

■■■ 20. All amounts paid under Sections 3505(a) or 3505(b) are to be credited against the employer's liability. 26 U.S.C. Section 3505(c). As a practical matter, this crediting reduces the liability of persons found liable under 26 U.S.C. Section 6672. Nevertheless, the Government is entitled to a judgment in the full amount against both the Section 3505 defendant found to be liable and the responsible officer found liable under Section 6672, just as in the case of two responsible officers under Section 6672. Obviously the Government can only collect once, but it is entitled to choose the liable parties from whom it will collect the unpaid trust funds. See Crompton-Richmond Co., Factors v. United States, 20 A.F.T.R.2d 5353 (S.D.N.Y., August 7, 1967).

21. The Government has the burden of proving that third-party defendant Julyn is liable under 26 U.S.C. Section 3505(a) for the unpaid trust funds of McDowell for the fourth quarter of 1967. The Government also has the burden of proving that third-party defendant Julyn is liable under 26 U.S.C. Section 3505 (b) for the unpaid trust funds of McDowell for the third quarter of 1967.

■■■ 22. Under Sections 3505(a) and 3505(b), the statutory phrase "lender, surety, or other person" contemplates any person who performs the acts set forth in the statute, whether that "person" be a jobber, a prime contractor, or simply a creditor. Any person who pays employees direct is liable under Section 3505(a). Julyn contends, however, that since all payments made by it to McDowell were made as a debtor of McDowell for work completed by the latter under a long-standing arrangement for advances on work in progress, it does not fall within the term "other person" in the context of Section 3505. While the evidence does not support this factual contention of Julyn, even if Julyn were cast in this posture, such an arrangement would not automatically immunize Julyn from liability under the statute. Any person who meets the other requirements of Section 3505, i. e., notice and specific purpose, is subject to the statutory liability regardless of the person's status as a debtor, creditor, prime contractor or jobber. cf. United States v. Algernon Blair, Inc., 441 F.2d 1379 (C.A. 5, May 6, 1971); United States v. Whilmar General Contractors, Inc., 25 A.F.T.R.2d 1306 (N.D.Tex., Jan. 29, 1970).

■■■ 23. Liability under 26 U.S.C. Section 3505(a) attaches as soon as payment is made directly to any employee, whether or not the payor is aware that the taxes should be deducted and withheld.

24. Liability under 26 U.S.C. Section 3505(b) presupposes advances for the specific purpose of paying wages with actual notice or knowledge that the trust funds will not or cannot be paid by the employer.

■■■ 25. Actual notice or knowledge under 26 U.S.C. Section 3505(b) means notice or knowledge as defined in 26 U.S.C. Section 6323(i)(1). See United States v. Algernon Blair, Inc., 441 F.2d 1379 (C.A. 5, May 6, 1971); United States v. Whilmar General Contractors, Inc., 25 A.F.T.R.2d 1306 (N.D.Tex., Jan. 29, 1970).[9]

9. These are the only two reported decisions under Section 3505. The statute was added to the 1954 Code by Section 105(a) of the Federal Tax Lien Act of 1966,

26. Third party defendant Julyn is a person within the meaning of 26 U.S.C. Section 3505.

27. Third party defendant Julyn paid direct to the employees of McDowell the wages due and owing them for the fourth quarter of 1967 within the meaning of 26 U.S.C. Section 3505(a).

28. Third party defendant Julyn advanced funds to McDowell for the specific purpose of paying employees wages for the third quarter of 1967 and such advances were made with actual notice or knowledge that McDowell would not, or could not, pay the deducted and withheld amounts to the Government, within the meaning of 26 U.S.C. Section 3505(b).

29. Plaintiff Abrams is liable under 26 U.S.C. Section 6672 for a penalty equal to the unpaid trust funds of Mercer in the amount of $1,298.23, plus interest as allowed by law from February 20, 1968, and judgment will be entered accordingly.[10]

30. Third-party defendant Leonforte is liable under 26 U.S.C. Section 6672 for a penalty equal to the unpaid trust funds of Mercer in the amount of $1,298.23, plus interest as allowed by law from February 20, 1968, and judgment will be entered accordingly.

31. Plaintiff Abrams is liable under 26 U.S.C. Section 6672 for a penalty equal to the unpaid trust funds of Mc-Dowell in the amount of $25,749.30, plus interest as allowed by law from February 20, 1968, and judgment will be entered accordingly.

32. Third-party defendant Leonforte is liable under 26 U.S.C. Section 6672 for a penalty equal to the unpaid trust funds of McDowell in the amount of $25,749.30, plus interest as allowed by law from February 20, 1968, and judgment will be entered accordingly.

33. Plaintiff Abrams is not entitled to prevail on either of his claims for a refund of the portions of the assessments made against him under 26 U.S.C. Section 6672 which he paid, and judgment will be entered accordingly.

34. Third-party defendant Julyn is liable under 26 U.S.C. Section 3505(b) for the unpaid trust fund taxes of Mc-Dowell for the third quarter of 1967 in the amount of $6,565.12, plus interest as allowed by law from October 31, 1967, and judgment will be entered accordingly.[11]

35. Third-party defendant Julyn is liable under 26 U.S.C. Section 3505(a) for the unpaid trust fund taxes of Mc-Dowell for the fourth quarter of 1967 in the amount of $1,063.33, plus interest as allowed by law from January 31, 1968, and judgment will be entered accordingly.

36. With the exception of the interest which is payable only by Julyn for the period beginning on the due date of the return and ending on February 20, 1968, the date notice of the assessments was sent under 26 U.S.C. Section 6672, the Government is entitled to collect, with respect to McDowell's unpaid trust funds, a total of $25,749.30, plus interest from February 20, 1968, to the date of the judgment, plus interest as allowed by law on the judgment, part or all of such amount from any party against whom a judgment has been entered. Such collection is naturally limited as to Julyn to the amounts specified in the judgment.

---

P.L. 89–179, 80 Stat. 1125, and did not become effective until January 1, 1967. This is apparently the first full trial on the merits under both Sections 3505(a) and 3505(b) and the first time the statute has been invoked by way of third-party practice.

10. The Government is entitled to interest on an assessment under 26 U.S.C. Section 6672 from the date notice and demand for payment are mailed, which in this case was four days after the assessment date of February 16, 1968 (Gov't. Ex.

386C). Liddon v. United States, *supra*, p. 514 of 448 F.2d.

11. Both 26 U.S.C. Section 3505(a) and 26 U.S.C. Section 3505(b) provide for a liability "equal to the taxes (together with interest)". Ordinarily, an employer is chargeable with a penalty for failure to make timely deposits of employment taxes, and interest starts accruing as of the due date of the quarterly return, which is 30 days after the end of the quarter. See 26 U.S.C. Section 6656; 26 U.S.C. Section 6601(a).

Counsel for the Government should make the interest computations and prepare an appropriate order. Taxable costs will be allowed in favor of the Government against all judgment debtors, jointly and severally, but limited against third-party defendant Julyn to the portion of allowable costs equal to the ratio which the total judgment against Julyn bears to the total aggregate amount which the Government is entitled to realize from the judgments.