**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PIRELLI CABLE CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

No. 97-1826

Respondent,

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, Local 2236,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                      No. 97-2017

PIRELLI CABLE CORPORATION,
Respondent.

On Petition for Review and Cross-application for Enforcement
of an Order of the National Labor Relations Board.
(11-CA-15987, 11-CA-16121, 11-CA-16149, 11-CA-16160,
11-CA-16300, 11-CA-16365, 11-CA-16475, 11-CA-16536,
11-CA-16670, 11-CA-16708, 11-CA-16727,
11-CA-16754, 11-CA-16844)

Argued: December 3, 1997

Decided: March 31, 1998

Before NIEMEYER and WILLIAMS, Circuit Judges, and JONES,
United States District Judge for the Western District of Virginia,
sitting by designation.

Petition granted in part and denied in part, cross-petition granted in part and denied in part, and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Niemeyer and Judge Jones joined.

_____

## COUNSEL

**ARGUED:** Charles Preyer Roberts, III, HAYNSWORTH, BALD-WIN, JOHNSON & GREAVES, Greensboro, North Carolina; William Melvin Haas, III, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, Macon, Georgia, for Pirelli. Sharon I. Block, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Sue D. Gunter, SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Robert D. Kurnick, SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C., Washington, D.C., for Intervenor.

_____

## OPINION

WILLIAMS, Circuit Judge:

Pirelli Cable Corporation (Pirelli) petitions for review from the National Labor Relations Board's (NLRB or the Board) final order determining that it had committed violations of§ 8(a)(1), (a)(3), and (a)(5) of the National Labor Relations Act (the NLRA or the Act). See 29 U.S.C.A. § 158(a)(1), (a)(3) & (a)(5) (West 1973 & Supp. 1997). The Board cross-petitions for enforcement of its order. For the reasons stated herein, we grant Pirelli's petition for review in part and deny it in part; we grant the Board's cross-petition for enforcement in part and deny it in part; and we remand the case to the Board for further proceedings consistent with this opinion.

2

I.

This case arises out of a number of different disputes that occurred between the members of the International Brotherhood of Electrical Workers, Local 2236, AFL-CIO (the Union) and their employer, Pirelli, a manufacturer of power distribution cables located in Abbeville, South Carolina. The conflicts between the Union and Pirelli culminated in a six-week strike, which took place from May 5, 1994, to June 20, 1994. The factual discussion that follows is drawn from the ALJ's findings, the record, and the parties' briefs.

The Union was recognized in 1967 as the exclusive representative of:

> All production and maintenance employees, including shipping and receiving employees, inspectors, and leadmen employed by [Pirelli] at its Abbeville, South Carolina, plant and warehouses, but excluding office clerical employees, professional employees, casual employees, guards, janitors, and supervisors as defined in the Act.

(J.A. at 932.) Until 1994, the Union and Pirelli had enjoyed a successful labor/management relationship. Successive collective bargaining agreements were in place from the time the Union was organized in 1967 until 1994 when the present dispute arose.

In March 1994, the Union and Pirelli entered into negotiations for a new contract to replace the agreement that was due to expire at midnight on May 1, 1994. Early in the bargaining process it became clear to the parties that reaching agreement over the terms of the new contract would be difficult. Pirelli requested that the Union make economic concessions due to some financial set-backs it had experienced. The President of Pirelli came to Abbeville in mid-March to give an overview of Pirelli's financial position. During his meetings with employees and with the Union bargaining committee, the President explained that its paper cable product was no longer viable and that Pirelli's overall profitability had been reduced.

The Union was not inclined to accept the proposed reductions in pay and benefits and stated that it was "not interested in entertaining

3

any company proposals that would reduce costs." (J.A. at 352.) The Union, disgruntled with Pirelli's "hard line" stance, began to speak to the membership in earnest about the possibility of a strike. Pirelli, wishing to avoid a strike, decided to circulate a letter to its employees, explaining its bargaining position and the potential consequences of a strike.

On April 20, 1994, a letter (the Q & A letter) was sent to all Pirelli employees expressing Pirelli's concerns about a potential strike and encouraging the employees to continue good faith negotiations. The two-page body of the letter addressed the financial difficulties Pirelli had encountered, noting specifically that both the demand for and price of their products had declined. Attached to the letter was a two-page list of nine questions and answers designed to convey information about the consequences of a decision to strike. Among the questions and answers was the following:

> Q. If I go out on strike, can I lose my job?
>
> A. Yes. The Company can continue operating the plant, and can hire strike replacements. If you strike in an attempt to force the Company to agree to the Union's economic demands or to force the Company to withdraw its economic demands, the Company may permanently replace you. When the strike ends you would not have a job if you had been permanently replaced.

(J.A. at 520.)

After the Q & A letter was circulated, the Union requested that Pirelli produce its "last, best, and final" offer. On May 1, 1994, the Union held a meeting at which it presented Pirelli's proposed contract to the membership. Additionally, the Union leaders discussed three unfair labor practice charges that they had filed with the NLRB's regional office on April 28, 1994. Because of these charges, the Union president informed the members that if they voted to strike, the strike would most likely be classified as an unfair labor practice strike, rather than as an economic strike. The latter classification would prevent striking workers from being permanently replaced.[1]

_____

[1] Section 2(3) of the Act provides that workers "whose work has ceased as a consequence of, or in connection with, any current labor dispute or

4

Approximately 200 employees attended the meeting and 97% of them voted to reject Pirelli's proposed contract and to go out on strike. Union leadership, however, obtained the members' consent to return to the bargaining table.

As of midnight, May 1, 1994, Pirelli determined that it had reached a bargaining impasse with the Union and unilaterally instituted the terms of the "last, best, and final" offer. The parties negotiated further. Union leadership presented a revised proposal to the membership on May 5, 1994. The proposal was rejected by 94% of those voting.

After the vote, the Union called a strike. The workers began their strike at noon on May 5, 1994, and the strike continued until June 20, 1994. During the strike Pirelli hired and trained replacement workers. Additionally, several striking workers crossed the picket line and returned to their jobs. As a result, the plant continued to operate while the Union was on strike.

On May 18, 1994, shortly after the strike was called, Pirelli sent a registered letter to its employee, James McCord. McCord was on disability leave and was receiving workers' compensation benefits as the result of a job-related injury to his foot. The letter stated that the personnel office understood that McCord was available for light duty work, and that if he did not report to the personnel director within twenty-four hours for assignment, he would be classified as a striker. McCord reported to the personnel office where they offered him a job

_____

because of any unfair labor practice" retain employee status. 29 U.S.C.A. § 152(3) (West 1973). "Employee Status," however, has a different meaning depending upon whether the strike is an economic strike or an unfair labor practice strike. Unfair labor practice strikers are entitled to immediate reinstatement upon their unconditional offer to return to work regardless of whether replacement workers have been hired by the employer during the strike. See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278 (1956). On the other hand, an employer is not required to return economic strikers to work immediately, nor is the employer required to displace replacement workers hired during a strike. See Winn-Dixie Stores, Inc. v. NLRB, 448 F.2d 8, 12 n.11 (4th Cir. 1971); Laidlaw Corp. v. NLRB, 414 F.2d 99, 105 (7th Cir. 1969).

5

in the die shop. McCord declined the position in the die shop because his foot injury prevented him from wearing the required safety shoes. No other light duty positions were offered, and Pirelli proceeded to classify McCord as a striker and terminated his insurance benefits.

On June 20, 1994, the Union president contacted Pirelli's chief negotiator and requested that the parties enter into further negotiations. Specifically, he inquired whether Pirelli would return all striking workers to their jobs with no reduction in seniority and pay them an "attitude bonus." Pirelli responded that those terms were not agreeable. Nevertheless, the Union president tendered a letter to Pirelli, offering the strikers' unconditional return to work.

Pirelli advised the Union president that replacement workers had been hired and that the striking employees would not immediately be able to return to their jobs. Instead, all workers who had an interest in returning to Pirelli would be placed on a preferential hiring list, ranked in order of seniority. The Union president signed an agreement with Pirelli that stated, "[a]s openings occur employees shall be returned in the order of their placement on that list and in accordance with their qualifications to perform the work available." (J.A. at 526.)

Despite the establishment of the preferential hiring list, Pirelli followed its customary procedure of posting open jobs for internal bidding. That procedure allowed workers in the plant to express an interest in open jobs before they would be filled with workers from outside the plant. As a result, the most desirable job openings were often filled through the bidding procedure before workers on the preferential hiring list were contacted. Additionally, Pirelli's personnel department made efforts to reduce the number of employees on the list. Often, workers were removed when Pirelli obtained information from outside sources that they had begun full-time employment with benefits elsewhere. Pirelli sent such workers written notification that they had been removed from the preferential hiring list.

In June 1994, shortly after the strike had ended, Pirelli's Abbeville plant manager, during a discussion with several employees, claimed that Pirelli intended to engage in delaying tactics and continue the litigation of the disputes arising from the strike for so long that any ordered payments would have to be made to strikers' grandchildren.

6

He further stated that certain workers would not be recalled from the preferential hiring list because of their participation in the strike and other Union activities.

In July 1994, Pirelli's employees circulated a petition to de-certify the Union as the exclusive collective bargaining representative. The petition garnered approximately 127 signatures. The petition was presented to Pirelli, and on August 1, 1994, Pirelli withdrew recognition from the Union. Because it no longer considered the Union to be the representative of its employees, Pirelli did not provide information to the Union, stopped processing grievances, and made many other unilateral changes to employment terms.

Pirelli continued to maintain the preferential hiring list long after the strike had ended and the Union was no longer active at the Abbeville facility. One employee called back to work from the preferential hiring list on September 24, 1995, Charles Tinch, was assigned to a position on the night shift -- 11:00 p.m. to 7:00 a.m. -- despite his sleep apnea condition. Although prior to the strike Tinch would often sleep during his shifts, Pirelli made multiple notations in his personnel file but did not formally discipline him for sleeping. Upon his recall, however, the personnel department questioned him extensively about the status of his sleep apnea condition and noted that based on the number of recorded instances of infractions in his record that he would have to improve his work performance. When Tinch's supervisor witnessed him sleeping during work hours on October 24, 1995, he was terminated.

II.

As a result of the foregoing events, the Union filed several unfair labor practice charges between April 1994 and October 1995. The Board's General Counsel issued complaints charging Pirelli with violations of § 8(a)(1), (a)(3), and (a)(5), see 29 U.S.C.A. § 158(a)(1), (a)(3) & (a)(5) (West 1973), of the NLRA based upon allegations that Pirelli was or had been: (1) interfering, coercing and restraining its employees' exercise of rights guaranteed under § 7 of the Act by using the Q & A letter of April 20, 1994, to threaten the employees with job loss if they engaged in lawful strike activity; (2) refusing to immediately reinstate unfair labor practice strikers; (3) refusing to

7

bargain collectively with the Union by unilaterally implementing changes in the job bidding procedure, shift schedules, lead person wages, vacation requests, shift swapping, shift selection, health insurance coverage, die control job requirements, attendance policy, number of allowable medical excuses, perfect attendance credit system, and call-in policy; (4) refusing to bargain collectively with the Union by withdrawing recognition of the Union; (5) refusing to bargain collectively with the Union by failing to provide the Union with an updated seniority list and copies of correspondence with employees; (6) threatening to "drag out" the litigation and stating that certain union officials would not be recalled because of their participation in the strike; and (7) refusing to bargain collectively with the Union by failing to abide by the terms of the grievance procedure.[2]

Two hearings regarding these allegations were held before the same ALJ on July 17-19, 1995, and May 28, 1996, in which the mer-

_____

[2] Complaints were also issued by the General Counsel on the following unfair labor practice charges: (1) threatening employees that positions would be eliminated in order to avoid reinstating economic strikers; (2) filling job vacancies through an internal bid procedure rather than through the preferential hiring list; (3) refusing to allow workers on the preferential hiring list to bid on job vacancies; (4) assigning supervisors to perform bargaining unit work; (5) refusing to reinstate Ricky Ferguson, William Riley, Jr., and John Buddy Wilson; (6) removing Samuel Flemming from the preferential hiring list; (7) failing to reinstate strikers in accordance with the agreement with the Union; (8) refusing to recall Howard Gray and James Cannady; (9) hiring temporary employees rather than recalling strikers; (10) terminating the employment rights of Winston Sparks, Franklin Page, Robert Prince, Eugene Gray, Samuel Brownlee, Kevin Sellers, Timothy Sparks, Stanley Chiles, Kim Ashley, Melvin Ashley, James Coleman, Robert Donaldson, Bernard Freeman, Wesley Gibson, Larry Gray, Dexter Harris, James Oliver, Bobby Lee Paul, Rhett Simpson, Johnny Slay, Lonnie Thompson, and Walter M. Anderson because they had obtained other employment; and (11) failing to recall un-reinstated strikers in accordance with the agreement with the Union. These charges were addressed by the ALJ in alternative holdings and were not addressed by the Board. Pirelli raises on appeal only the final determinations made by the Board. See 29 U.S.C.A. § 160(f) (West 1973) (providing that an aggrieved party may file a petition for review only for final orders of the Board).

its of the unfair labor practice complaints were litigated. As a result, the ALJ issued two opinions. In the first Decision and Order (Pirelli I), the ALJ determined that the question and answer concerning the possibility of hiring replacement workers contained in the Q & A letter was an unlawful threat of termination in violation of § 8(a)(1) of the NLRA. He found that the letter caused employee anger and that their anger was a contributing cause of the strike. As a result, he concluded that the May 5, 1994, strike was an unfair labor practice strike.[3] Because the strike was an unfair labor practice strike, the ALJ determined that Pirelli's failure immediately to reinstate the workers upon their unconditional offer to return to work violated § 8(a)(3) of the NLRA. The ALJ further determined that Pirelli unlawfully de-certified the Union because unremediated unfair labor practices at the plant tainted the de-certification petition. Consequently, because the Union de-certification was improper, the ALJ held that Pirelli's unilateral changes in employment terms and conditions were violative of § 8(a)(5) of the Act. Additionally, the ALJ determined that Pirelli's termination of James McCord, who had been on disability leave, was a violation of § 8(a)(1), (a)(3), and (a)(5) of the NLRA. Finally, the ALJ held that statements made by the plant manager informing employees that Pirelli intended to drag out the litigation of this matter and would make efforts not to reinstate the strikers were violative of § 8(a)(1) of the Act.

As a remedy for the unfair labor practices resolved in Pirelli I, the ALJ ordered the reinstatement of 154 workers.[4] Additionally, the ALJ

_____

[3] The ALJ also made several alternative holdings in Pirelli I assuming, arguendo, that the strike was an economic strike. He held that Pirelli violated § 8(a)(1) and (a)(3) of the Act when it: delayed recalling economic strikers by filling jobs from the pool of replacement workers through a new bidding procedure; required workers to return a letter before they were placed on the preferential hiring list; combined jobs and eliminated positions without proof of a business justification for doing so; made distinctions on its preferential hiring list among workers who had individually made an unconditional offer to return to work and workers who were part of the Union's unconditional offer to return to work; terminated Samuel Flemming and John Wilson; refused to recall Ricky Ferguson; and failed to reinstate William Riley.

[4] The ALJ ordered that Pirelli offer "full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed and discharging if necessary any replacement employees in those positions." (J.A. at 940.)

9

ordered Pirelli to make the former strikers whole for their lost earnings and benefits. The ALJ also ordered recognition of and bargaining with the Union.

In the second Decision and Order (Pirelli II ), the ALJ assumed arguendo that the strike was an economic strike and determined that Pirelli failed to meet the burden of proof necessary to justify the termination of workers from the preferential hiring list. The ALJ held that Pirelli terminated workers without proof that each had attained "substantially equivalent employment with another employer so as to extinguish his rights as an employee with his original employer against whom he engaged in a strike." (J.A. at 945.) Further, the ALJ determined that Pirelli violated § 8(a)(1), (a)(3), and (a)(5) of the Act when it rehired former strikers through a temporary agency, treating them as new employees, rather than recalling them from the preferential hiring list. Finally, the ALJ determined that the firing of Charles Tinch was a result of anti-union discrimination in violation of § 8(a)(1) and (a)(3) of the NLRA. In Pirelli II the remedy for the unfair labor practices included the reinstatement, with full seniority and financial restitution, of twenty-three workers, including Tinch.**5**

The Board reviewed Pirelli I and Pirelli II as consolidated cases and addressed the ALJ's determinations in a single opinion. The Board affirmed the ALJ's determination that the section of the Q & A letter discussing whether strikers could lose their jobs constituted an unfair labor practice in violation of § 8(a)(1) of the Act. The Board therefore also affirmed the ALJ's determination that the strike was an unfair labor practice strike.**6** Thus, it did not review any of the ALJ's determinations grounded on the assumption that the strike was an economic strike. Additionally, the Board held that, without regard to whether the strike was an economic or unfair labor practice strike,

_____

**5** These workers had already been ordered reinstated in Pirelli I. The Pirelli II opinion, however, was premised entirely on the Board's possible rejection of the Pirelli I determination that the strike was an unfair labor practice strike.

**6** As a result of this unfair labor practice determination, the Board affirmed the ALJ's finding that the refusal to reinstate strikers upon their unconditional offer to return to work was an unfair labor practice in violation of § 8(a)(1) & (a)(3) of the Act.

10

Pirelli committed unfair labor practices when it discriminatorily terminated Charles Tinch and James McCord. Further, the Board affirmed the determination that the threat made by the plant manager to prevent certain strikers' reinstatement and "drag out" the present litigation was an unfair labor practice.[7] (J.A. at 926.) Finally, the Board affirmed the ALJ's holding that Pirelli violated § 8(a)(5) by unilaterally withdrawing recognition from the Union. Consequently, the Board found that the unilateral changes in employment terms, beginning in August 1994, were also violations of the Act. Thus, the Board ordered that Pirelli reinstate 155 workers and make them whole for their financial losses.[8] The Board also ordered recognition of, and upon request, bargaining with, the Union.

Pirelli petitions for review on several grounds. First, Pirelli argues that the Board's conclusion that the strike was an unfair labor practice strike rather than an economic strike is neither supported by substantial evidence nor consistent with the Act. Therefore, Pirelli contends that all conclusions flowing from that determination are in error. Second, Pirelli contends that the de-certification of the Union was lawful and that therefore the Board's determination that it made unlawful unilateral changes to the terms and conditions of employment at the plant is not supported by substantial evidence. Third, Pirelli disputes the Board's determination that its former employees James McCord and Charles Tinch were terminated in violation of the Act. The Board cross-petitions for enforcement of its order.[9]

Because we agree with Pirelli that the Board's holding that the strike was an unfair labor practice strike was in error, we reverse the Board's order on that point and we remand the case for reconsideration in light of our determination that the strike was an economic strike. Additionally, we find that the Board's determination that the de-certification petition was tainted (and therefore could not provide "good faith doubt" for the Union de-recognition) was based upon

_____

[7] Pirelli does not appeal this determination. Therefore, the Board's order regarding this unfair labor practice shall be enforced.
[8] One worker had been inadvertently omitted from the ALJ's order.
[9] The Union is a party to this appeal as an intervenor. It simply argues that we should enforce the Board's unfair labor practice determinations in all respects.

11

faulty analysis. Thus, we reverse the Board's order on that point as well. Consequently, all unfair labor practice determinations stemming from the unilateral imposition of changes in the terms and conditions of employment after the Union was de-certified in August of 1994 must also be reversed. Further, because we determine that Pirelli met its burden of proving that Charles Tinch was terminated on a lawful, non-discriminatory ground, we reverse the Board's order as to Tinch. Finally, we agree that James McCord was unlawfully terminated in violation of the NLRA, and we enforce the Board's order in part.

III.

Pirelli challenges several of the Board's unfair labor practice findings on the basis that substantial evidence does not support the Board's application of the law to the facts of its case.

The Board's legal interpretations of the NLRA are entitled to deference. See Holly Farms Corp. v. NLRB, 116 S. Ct. 1396, 1406 (1996). If the Board's interpretations are rational and consistent with the Act, they will be upheld by reviewing courts. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42 (1987). In mixed questions, the Board's application of legitimate legal interpretations to the facts of a particular case should be upheld if they are supported by substantial evidence based upon the record as a whole. See id.; Beth Israel Hospital v. NLRB, 437 U.S. 483, 501 (1978). Likewise, the Board's factual determinations are "conclusive" if supported by "substantial evidence upon the record considered as a whole." 29 U.S.C.A. § 160(e) (West 1973); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 493 (1951). Substantial evidence is "more than a scintilla," but "less than a preponderance." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Allentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 823 (1998) (describing substantial evidence as enough evidence so that "on [the] record it would have been possible for a reasonable jury to reach the Board's conclusion"). Substantial evidence review is an objective assessment of the sufficiency of the evidence. See Allentown Mack, 118 S. Ct. at 828.

12

"In searching `the whole record' for substantial evidence, a reviewing court `must take into account whatever in the record fairly detracts' from the Board's fact finding as well as evidence that supports it." Soule Glass & Glazing Co. v. NLRB , 652 F.2d 1055, 1073 (1st Cir. 1981) (quoting Universal Camera, 340 U.S. at 487-88.) "When the Board purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Allentown Mack, 118 S. Ct. at 829. Courts performing substantial evidence review, therefore, must examine whether the Board considered all of the reasonable inferences compelled by the evidence in reaching its decision. See id.

The Board may draw different inferences from the facts and may reach different legal conclusions than did the ALJ. See American Thread Co. v. NLRB, 631 F.2d 316, 320 (4th Cir. 1980). Such deviations from the ALJ's inferences or conclusions are also reviewed under the substantial evidence standard. See Universal Camera, 340 U.S. at 496. Decisions by the Board, however, to make differing credibility determinations than did the ALJ are given closer scrutiny by reviewing courts because the Board did not have the opportunity to observe the witnesses. See id. at 496-97.

We review the Board's decision accordingly.

IV.

A.

Whether a strike is an "unfair labor practice strike" or an "economic strike" has a significant effect on the rights and responsibilities of management and labor. Section 2(3) of the Act provides that workers "whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice" retain employee status. 29 U.S.C.A. § 152(3) (West 1973). Both unfair labor practice and economic strikers are therefore considered "employees" both during and after the strike but the contours of their employee status differ significantly depending upon whether the strike is classified as an unfair labor practice strike or as an economic strike.

13

When a strike is determined to be an unfair labor practice strike, striking employees cannot lose their jobs as a result of the strike, even when replacements have been hired. See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278 (1956). Unfair labor practice strikers are entitled to immediate reinstatement upon their unconditional offer to return to work, or if reinstatement is a result of litigation, reinstatement with back pay. See id.; NLRB v. International Van Lines, 409 U.S. 48, 50-51 (1972); NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378 (1967). In contrast, economic strikers need not be immediately returned to work, nor do they enjoy the right to displace replacement workers hired during a strike. See Winn-Dixie Stores, Inc. v. NLRB, 448 F.2d 8, 12 n.11 (4th Cir. 1971); Laidlaw Corp. v. NLRB, 414 F.2d 99, 105 (7th Cir. 1969).

"An unfair labor practice strike is strike activity initiated in whole or in part in response to unfair labor practices committed by the employer." 2 Developing Labor Law at 1100 (Patrick Hardin, et al. eds., 3d Ed. 1992) (citing NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333 (1938)). An economic strike is one that is not caused by an unfair labor practice. See id.

Pirelli challenges the Board's determination that the 1994 strike at its Abbeville plant was an unfair labor practice strike. It does so on two grounds. First, Pirelli alleges that the Q & A letter was neither threatening nor coercive, and thus was not violative of § 8 (a)(1) of the Act.**10** Therefore, it contends that it committed no unfair labor practice prior to the strike. Additionally, Pirelli contends that even if its Q & A letter was threatening or coercive, the letter was not a contributing cause of the strike. We address these arguments in turn.

1.

In Be-Lo Stores v. NLRB, 126 F.3d 268, 285-86 (4th Cir. 1997), we recently addressed the issue of when a communication from an employer to its employees is threatening or coercive in violation of

_____

**10** Section 8 (a)(1) provides that"[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 157 of this title." 29 U.S.C.A. § 158(a)(1) (West 1973).

14

§ 8(a)(1) of the Act. In Be-Lo Stores, we reversed the Board's determination that the distribution of a mock pink slip, one sentence of which read, "you may want to look at what the[Union] got for their former dues payer[s] in this area -- a pink slip," was coercive and threatening. Be-Lo Stores, 126 F.3d at 285 (internal quotation marks and citation omitted).

We determined that, when the statement was considered in context, the communication was neither threatening nor coercive within the meaning of § 8(a)(1) of the Act. Instead, the employer's communication was only an attempt to explain the possible consequences of unionization at the store and was therefore a "carefully phrased prediction as to demonstrably probable consequences beyond Be-Lo's control." Id. at 286 (internal quotation marks, alteration, and citation omitted). Because the pink slip was not a threat, but rather was an explanation of the company's concerns regarding the possible economic consequences of unionization, it was "free speech and legitimate propaganda" protected by § 8(c) of the Act. Id.; 29 U.S.C.A. § 158(c) (West 1973).

As it did in Be-Lo Stores, the Board in this case examined one isolated paragraph of a four page letter and concluded that the Q & A letter was threatening and coercive because it was"threatening employees with the loss of their jobs if they went out on strike." (J.A. at 924.) In context, Pirelli's statement that employees could "lose their jobs" if they go out on strike is not threatening, it is explanatory. Pirelli took great pains in its letter to first explain the economic rationale for its bargaining position. The letter stated that "Pirelli Cable North America (PCNA) has lost tens of millions of dollars . . . . Demand for our products has declined 30% and our prices are down 20%. This means we sell less product and for the product we do sell we get a lower price." (J.A. at 518.) The letter continued to explain: "[t]hese are dire economic times for PCNA and all its employees. Like many other companies in these difficult times, PCNA has had no choice but to take actions to reduce our costs in order to offset declining volume and prices." (J.A. at 518.) As a preface to the questions and answers attached to the letter Pirelli further stated "[a]s all of us continue to hope that an agreement can be achieved at the bargaining table, it is important that everyone understand some of the basic realities of a work stoppage." (J.A. at 519.)

15

Like the mock pink slip in <u>Be-Lo Stores</u>, the Q & A letter sent by Pirelli explained economic circumstances beyond Pirelli's control that had the potential for affecting the future of the bargaining unit employees. The specific Q & A that forms the basis of the unfair labor practice charge states:

> Q. If I go out on strike, can I lose my job?
>
> A. Yes. The Company can continue to operate the plant, and can hire strike replacements. If you strike in an attempt to force the Company to agree to the Union's economic demands or to force the Company to withdraw its economic demands, the Company may permanently replace you. When the strike ends, you would not have a job if you had been permanently replaced.

(J.A. at 520.)

This Q & A was an explanation of bargaining unit workers' <u>Laidlaw</u> rights and was not a threat of reprisal for strike activity. <u>See Laidlaw Corp. v. NLRB</u>, 414 F.2d 99, 105 (7th Cir. 1969); <u>see also Clinch Valley Clinic v. NLRB</u>, 516 F.2d 996, 998 (4th Cir. 1975) (adopting the <u>Laidlaw</u> rationale). <u>Laidlaw</u> rights include the employer's right to fill open positions during a strike with replacement workers. <u>See Mackay</u>, 304 U.S. at 345-46; <u>accord Laidlaw</u>, 414 F.2d at 105. If the strike is an economic strike, the employer need not terminate replacement workers when strikers seek to return to work. <u>See NLRB v. Fleetwood Trailer Co.</u>, 389 U.S. 375, 379 (1967); <u>Laidlaw</u>, 414 F.2d at 105. The employer need only place its strikers on a preferential rehiring list and call them back when an opening becomes available. <u>See Laidlaw</u>, 414 F.2d at 106. The Q & A simply conveyed to workers the realities of striking over economic matters: Economic strikers may be replaced by replacement workers. <u>See Winn-Dixie Stores, Inc. v. NLRB</u>, 448 F.2d 8, 12 n.11 (4th Cir. 1971). That the Q & A letter, although it did not make an incorrect statement, did not contain a detailed explanation of <u>Laidlaw</u> reinstatement rights and did not make the statement that strikers remained employees of Pirelli does not alter our disposition. An explanation of the possible results of labor/management tensions does not become threatening or coercive merely because it is in plain English rather than in legal jargon.

16

Therefore, following the analysis set forth in Be-Lo Stores, we determine that Pirelli's Q & A letter is not threatening or coercive.

2.

Even assuming that the Q & A letter violated§ 8(a)(1), we would reverse the Board's determination on causation grounds. It is well settled that there must be a causal link between the unfair labor practice and the strike before the strike can be classified as an unfair labor practice strike. See Winn-Dixie Stores, 448 F.2d at 11; NLRB v. Birmingham Publishing Co., 262 F.2d 2, 9-10 (5th Cir. 1959). There must be proof that an unfair labor practice was a contributing cause of the work stoppage. See Allied Mech. Servs., Inc. v. NLRB, 113 F.3d 623, 626 (6th Cir. 1997); Capitol Steel & Iron Co. v. NLRB, 89 F.3d 692, 698 (10th Cir. 1996); NLRB v. Crystal Springs Shirt Corp., 637 F.2d 399, 404 (5th Cir. 1981); General Drivers & Helpers Union, Local 662 v. NLRB, 302 F.2d 908, 911 (D.C. Cir. 1962). The mere fact that an unfair labor practice occurred before a strike is not sufficient proof of causation. See Road Sprinkler Fitters Local No. 669 v. NLRB, 681 F.2d 11, 20 (D.C. Cir. 1982) (noting that "mere awareness of unfair labor practices is insufficient to establish [the] causal connection"). There must be evidence that the strike was motivated by the employees' desire to vindicate their rights under the NLRA. See Winn-Dixie Stores, 448 F.2d at 11. Because the single Q & A from the Q & A letter is the basis for the sole unfair labor practice determined to have occurred before the strike, substantial evidence must support the determination that the threat contained in the letter was a contributing cause of the strike. Based upon our review of the record, substantial evidence does not support the finding that the workers were angered by the "threat of job loss in the letter." Further, there is no substantial evidence to support the conclusion that the workers were at all motivated to strike because of threats of interference, coercion, or restraint contained in the letter. See 29 U.S.C.A. § 158(a)(1) (West 1973).

In its opinion, the Board adopted the factual findings made by the ALJ in Pirelli I regarding the Q & A letter. The ALJ specifically credited the testimony of three union-related individuals in reaching his conclusion that the Q & A letter was a contributing cause of the strike at the Pirelli plant. First, he cites the"unrebutted" testimony of

17

Han Massey. At the time of the strike, Massey was not an employee at the Pirelli plant. Rather, he was the international representative of the Union whose job included working with local bargaining units during periods of labor/management contract negotiation. Massey's testimony in reference to the Q & A letter is quite limited. He testified that the Union's bargaining committee was upset by the letter because the committee members thought that the letter undermined their authority. Massey further explained that, during the May 1 contract ratification meeting, he told the Union membership that an unfair labor practice charge had been filed because of the Q & A letter.[11] Massey's testimony, therefore, provides no support for the conclusion that the members felt threatened or coerced by the Q & A letter. As he was not an employee of Pirelli, nor a member of the bargaining unit, his feelings about the Q & A letter are completely irrelevant to the causation question before us. He could not vote to strike.

The ALJ also credited the testimony of David Land, the local Union president. Like Massey, Land testified that he felt that the letter would undermine the Union. He perceived that "the people were getting a little angry about [the letter]." [12] He also stated that he told the Union membership that "I felt like they were threatening us with that letter. We'd been in negotiations before, we'd never seen anything

_____

[11] Massey stated that "[s]ome of the people wanted to know if filing this charge would protect them or what would happen if they went on strike and there was a charge filed, as they were quite upset about the letter." (J.A. at 89.) No evidence on the record clarifies why the workers were upset. The Union members received the Q & A letter at home before the Union explained the differences between an unfair labor practice strike and an economic strike. Without forewarning from the Union that Pirelli could continue to operate the plant and hire permanent replacements for economic strikers, it is likely that receipt of the Q & A letter would cause shock and anxiety. Being upset as a result of the surprising, but factually correct, contents of the letter is distinguishable from reacting to a threat. Only the latter response can form the basis of an unfair labor practice.

[12] Land's testimony does not provide an explanation regarding why he felt the union members were angry about the letter. In his testimony, he does not refer to any specific conversations he had with union members. Further, his testimony omits any reference as to why the union members were angry. See ante n.11.

18

like this [letter] before, and we felt like it was threats by them to try to force us into taking what they wanted it to take." (J.A. at 175.) Land's statement did not convey a feeling that Pirelli threatened the members with termination should they vote to go out on strike. Rather, his statement conveys his feeling that Pirelli's decision to communicate directly with its own employees threatened the Union's bargaining position.

Finally, the ALJ stated that the testimony of Ernest Warren supported his conclusion that the letter was a contributing cause of the strike. Warren was a member of the Union negotiating committee. When asked what was said at the ratification meeting about the letter, Warren testified that the Union leadership discussed that the letter was the basis of one of the unfair labor practice charges and that the Union leaders assured the workers that the strike was likely to be an unfair labor practice strike because of the charges. Warren's testimony is limited to a discussion of the filing of unfair labor practice charges and is not at all relevant to the Union membership's response to the letter. Therefore, it provides no evidentiary support for the proposition that the Q & A letter was a contributing cause of the strike.

"[I]n examining the union's characterization of the purpose of the strike, the Board and court must be wary of self-serving rhetoric of sophisticated union officials and members inconsistent with the true factual context." Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1080 (1st Cir. 1981) (citing NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 705 (7th Cir. 1976), and Winter Garden Citrus Prods. Inc. v. NLRB, 238 F.2d 128, 130 (5th Cir. 1956)); see also Winn Dixie Stores, 448 F.2d at 11-12 (holding that substantial evidence did not support Board's finding of unfair labor practice strike where conclusion was based on self-serving testimony of four workers); F.L. Thorpe & Co. v. NLRB, 71 F.3d 282, 291 (8th Cir. 1995); SKS Die Casting & Machining, Inc. v. NLRB, 941 F.2d 984, 992 (9th Cir. 1991); cf. Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 568 (7th Cir. 1995) (addressing self-interested testimony of union officials in dispute over retirement funds).

Here, the ALJ and the Board exclusively credited self-serving testimony of three Union officials -- an international Union representa-

19

tive, the local Union president, and a member of the Union negotiating team -- when it determined that the Q & A letter was a contributing cause of the strike. As we noted in Winn-Dixie Stores, such testimony is highly "suspect." 448 F.2d at 11. Not only is the testimony cited by the ALJ solely from Union officials, but the statements fail to advance the argument that the Union members were motivated to strike because they had an interest in vindicating their right to be free from coercion. See 29 U.S.C.A. § 158(a)(1) (West 1973). The testimony demonstrates that the Union officials were angry because they felt that the letter from Pirelli undermined the Union's bargaining position.

Evidence of Union officials' ire is not sufficient to constitute substantial evidence that the letter was a contributing cause of the strike. Here, the Board, without substantial evidence of the membership's reaction to the letter, equates Union leadership sentiment with Union membership sentiment. In so doing, the Board does not make a reasonable inference based upon the evidence. Instead, it makes a leap of faith. The conclusion that the rank and file had the same reaction as members of the negotiating committee is simply not substantiated by the record.

Rather than demonstrating that the Union leadership was motivated by grassroots member complaints to file an unfair labor practice charge on the basis of the letter, the evidence cited by the ALJ leads to a contrary conclusion -- that the Union leadership made a strategic decision to file an unfair labor practice charge because the charge had the potential of shielding Union members from the consequences of an economic strike. A strategic decision by savvy Union officials does not lead to any inference regarding the motivation of the Union membership. The Board failed to draw all of the reasonable inferences presented by the evidence, and perhaps it failed to draw the most reasonable conclusion: that the membership was more motivated to vote to strike in the presence of the unfair labor practice charge than in its absence, but not because they were angered by the "threats" contained in the letter. Members were reassured by the Union officials that the unfair labor practice charge would protect them from being permanently replaced. As the testimony cited by the ALJ indicates, at the meeting in which the members voted on Pirelli's final offer, Union officials stood up and explained the difference between

20

an unfair labor practice strike and an economic strike and reassured the membership that because of the unfair labor practice charges that had been filed, the strike was likely to be classified as an unfair labor practice strike.

To conclude that union members would be more motivated to vote in favor of an unfair labor practice strike than in favor of an economic strike is a reasonable inference. Unfair labor practice strikers have more rights and protections. The motivation to have one's cake and eat it too -- attaining the protections of unfair labor practice strikers while striking for economic reasons -- is not motivation to vindicate one's NLRA-protected rights and thus cannot lead to a finding of causation. We cannot hold that an unfair labor practice was a contributing cause of the strike merely because the Union members' votes were premised on leaders' reassurances that the members would enjoy the protections concomitant with the designation "unfair labor practice strike."

An unfair labor practice strike is a sword to be used by Union members to vindicate violations of their rights under the NLRA; it is not a shield to protect their jobs from the potential legitimate consequences of an economic strike. Here, the Union leaders wanted the unfair labor practice charge to protect union members from the consequences of their refusal to accept their employer's demand for economic concessions. The Board, in assessing the case for causation, does not acknowledge this obvious and reasonable inference. The Board did not examine all of the reasonable inferences that should be drawn from the evidence. See Allentown Mack Sales & Serv., 118 S. Ct. at 824-25. Rather, the Board interpreted the evidence in the light most favorable to the Union. The Board is not at liberty to accept only those evidentiary inferences that support the Union's position and reject all of those that support the employer. See id. Based upon the evidence before the Board, no reasonable person could have concluded that the membership of the Union was motivated to vindicate the NLRA-protected right to be free from an employer's coercion or intimidation.

3.

In summary, because we determine that the Q & A letter was an explanatory statement of the law, not a threat of termination should

21

the workers vote to strike, see Be-Lo Stores, 126 F.3d 285-86, and it did not motivate the Union membership to go out on strike, we reverse the Board's determination that the Q & A letter constituted an unfair labor practice and reverse the Board's holding that the strike was an unfair labor practice strike. Therefore, we remand to the Board for reconsideration of the ALJ's numerous alternative holdings based upon the initial conclusion that the strike was an economic strike.

B.

Pirelli challenges the Board's holding that it committed violations of § 8(a)(5) of the Act, which makes it an unfair labor practice "to refuse to bargain collectively with the representatives of [the] employees," 29 U.S.C.A. § 158(a)(5) (West 1973), when it withdrew recognition from the Union on August 1, 1994, and thereafter unilaterally implemented changes in the terms and conditions of employment at the plant. Pirelli attacks the Board's finding that the de-certification petition was tainted and therefore cannot give rise to a good faith doubt. It claims that the Board's conclusion is based upon an erroneous interpretation of the facts and therefore is not based upon substantial evidence. We agree that the Board based its decision that the petition was tainted upon an incorrect understanding of the facts. Additionally, the other bases upon which the Board rested its conclusion that the petition was tainted are also incorrect. Therefore, we reverse the Board's determination that the de-certification was improper.

An employer may not lawfully refuse to bargain with its employees' certified collective bargaining representative during the term of a collective bargaining agreement. See 29 U.S.C.A. § 158(a)(5) (West 1973); Auciello Iron Works, Inc. v. NLRB, 116 S. Ct. 1754, 1758 (1996) (explaining that a union enjoys conclusive presumption of majority status during term of collective bargaining agreement). Upon expiration of a collective bargaining agreement, a union enjoys a rebuttable presumption of majority status. See Auciello Iron Works, 116 S. Ct. at 1758. To rebut the presumption, an employer must show "either (1) the union did not in fact enjoy majority support, or (2) the employer had a `good-faith' doubt, founded on a sufficient objective basis, of the union's majority support." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 778 (1990). A good-faith doubt is a "genu-

22

ine, reasonable uncertainty about whether [the union] enjoy[s] the continuing support of a majority of unit employees." Allentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 823 (1998).

"A petition signed by at least half of the bargaining unit's members in which they indicate that they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status." NLRB v. D & D Enters., Inc., 125 F.3d 200, 209 (4th Cir. 1997). Such a petition provides a "good faith and reasonably grounded doubt, founded upon a sufficient objective basis." Virginia Concrete Co. v. NLRB, 75 F.3d 974, 979 (4th Cir. 1996).

When, however, evidence is presented by the General Counsel to show that the employees are disgruntled with union representation because the employer has committed unfair labor practices that have negatively impacted the union's efficacy, the petition may be considered tainted. See D & D Enters., Inc., 125 F.3d at 209. Tainted petitions cannot give rise to a good faith doubt regarding the union's continuing majority status. See id.

The ALJ determined that the petition was facially insufficient to provide good faith doubt in the continuing majority status of the Union because it contained only 127 signatures, which, according to the ALJ, represented fewer than half of the bargaining unit members. The Board tacitly reversed the ALJ's assessment of the facial validity of the petition and based its holding that the de-certification of the Union was improper solely upon the ground that the petition was tainted. We agree with the Board's determination on this point. The ALJ's conclusion that the petition was facially invalid was not supported by substantial evidence because it was not based upon an accurate calculation of the number of bargaining unit employees at the time the petition circulated. See Virginia Concrete Co., 75 F.3d at 977-78 (explaining the appropriate procedure for counting bargaining unit employees). Thus, we proceed to review the Board's holding that the petition was tainted by unresolved unfair labor practices.

The Board employs a four-factor analysis to determine whether a de-certification petition has been tainted by an employer's unfair

23

labor practices. See D & D Enters., Inc., 125 F.3d at 209. Those four factors are:

> (1) the length of time between the unfair labor practice and the de-certification petition; (2) the nature of the employer's illegal acts; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

Id.

Applying this four-part analysis, the Board determined that several unfair labor practices committed by Pirelli had tainted the de-certification petition it had received in July 1994. The Board found that the following were serious illegal acts that collectively caused employee disaffection with the union and harmed morale: (1) the Q & A letter, (2) the unilateral illegal implementation of new terms and conditions of employment on May 2, 1994, and (3) the failure to immediately reinstate the unfair labor practice strikers. Further, the Board determined that the illegal acts occurred within a very short time frame of the petition's circulation. Therefore, the Board determined that Pirelli could not show a good faith doubt regarding the Union's continuing majority status because the petition was tainted by "the cumulative effect of [Pirelli's] unlawful conduct." For the reasons that follow, we disagree that the petition was tainted.

First, the Board attributed taint to the illegal Q & A letter. As previously discussed in Part IV.A.1, we determine that the Q & A letter does not constitute an unfair labor practice. Therefore it cannot taint the petition.

Second, in its determination that the petition was tainted, the Board emphasized that the petition was signed shortly after Pirelli's failure to reinstate the unfair labor practice strikers. As we stated above, because the strikers were economic strikers, they were not entitled to immediate reinstatement. Because the non-reinstatement was not an unfair labor practice, it cannot taint the de-certification petition.

24

Finally, the Board found that Pirelli violated § 8(a)(5) of the Act when it unilaterally implemented the terms and conditions of the final offer on May 2, 1994, noting that Pirelli "does not claim that a bargaining impasse existed" as of May 2, 1994. (J.A. at 925 n.8.) This unfair labor practice, the Board concluded, caused disaffection among Union members at the plant, leading to a tainted de-certification petition.

The Board's statements regarding the § 8(a)(5) charges stemming from the imposition of the terms of the final offer on May 2, 1994, are plainly inconsistent with the prior proceedings in the Pirelli case. By letter dated June 21, 1994, the Board's Regional Director refused to issue a complaint relating to the Union's charge that Pirelli committed a § 8(a)(5) violation when it implemented the terms of the final offer on May 2, 1994. The Regional Director's letter stated, "[u]nder these circumstances . . . and the presence of apparent irreconcilable differences outstanding as of April 29, the Employer's declaration of impasse appears lawful." (J.A. at 674.) On appeal, the Office of the General Counsel sustained the Regional Director's determination. (J.A. at 671.) Therefore, the Board erroneously stated that Pirelli had been found responsible for a § 8(a)(5) violation based upon implementation of the terms and conditions of the final offer on May 2, 1994, when, in fact, no complaint had been issued on that particular charge. Additionally, the Board erred when it stated that Pirelli did not claim that a bargaining impasse existed. Not only had it claimed that a bargaining impasse existed, but the Regional Director determined that the declaration of impasse was lawful. Obviously, the portion of the Board's analysis that rests upon a non-existent unfair labor finding stemming from the May 2, 1994, unilateral imposition of the terms of the final offer is based upon completely erroneous factual premises, and therefore also cannot taint the petition.

As a result of the Board's error and our decision that the strike was an economic strike, the Board's analysis of whether Pirelli had a good faith doubt supporting its decision to de-certify the Union is invalid. Therefore we reverse the Board's holding that Pirelli did not have good faith doubt as to the continuing majority status of the Union. As a result, we also reverse the Board's decision that Pirelli committed several § 8(a)(5) violations when it unilaterally changed the terms and

25

conditions of employment in August 1994 after the union was de-certified.

C.

Pirelli additionally challenges the Board's decisions that it committed § 8(a)(1) and (a)(3)[13] violations when it terminated James McCord and Charles Tinch. Pirelli claims that the unfair labor practice findings are not supported by substantial evidence and therefore should be reversed.

1.

Pirelli contends that McCord was available for light duty work and legitimately was classified as a striker because he failed to accept the light duty work that was offered to him. The Board's decision, however, that McCord was unlawfully terminated in violation of § 8(a)(1) and (a)(3) is supported by substantial evidence. Accordingly, we grant the Board's cross-petition for enforcement in part.

McCord was on disability leave at the time of the strike because his foot had been seriously injured. While still on leave, he received a registered letter at his home telling him that he needed to report to the personnel office immediately, or face re-classification as a striker. McCord immediately reported to the personnel office.

McCord's uncontradicted testimony was that the only "light duty" work offered by Pirelli was not appropriate for his medical condition because the job required that he wear safety shoes, something he could not do because of his foot injury. The die shop position that was offered to him involved lifting heavy spools of cable. Without the required safety shoes, McCord's recently injured foot would be unprotected from potential mishaps during the heavy lifting. According to his testimony, when McCord rejected the die shop job because he could not wear the requisite safety equipment, the Pirelli official

_____

[13] Section 8(a)(3) of the Act classifies "discrimination in regard to hire or tenure of employment or any term or condition of employment" on the basis of union membership as an unfair labor practice. 29 U.S.C.A. § 158(a)(3) (West 1973).

26

sarcastically offered to put him to work cleaning up his desk. Pirelli offered no other light duty job options, classified McCord as a striker, and terminated his disability benefits because he was "on strike."

An employee who is on disability leave because he is physically unable to work at the time of a strike cannot be categorized as a striker because his failure to report to work does not reflect a conscious decision to withhold employment services. See Texaco, Inc. v. NLRB, 700 F.2d 1039, 1043 (5th Cir. 1983) (enforcing Board's ruling that failure to state opposition to strike by workers on disability leave cannot lead to termination of benefits); NLRB v. Babcock & Wilcox Co., 697 F.2d 724, 729 (6th Cir. 1983) (stating that when an employee is on disability leave his mere failure to work during a strike is not evidence of participation in the strike); E.L. Wiegand Division v. NLRB, 650 F.2d 463, 474 (3d Cir. 1981) (holding that employer may not terminate worker's disability benefits when he publicly supports a strike because disabled employee cannot withhold employment services).

The record demonstrates that at the time he was summoned into the Pirelli personnel office McCord still had significant limitations on his ability to work. Unrebutted testimony illustrates that the only light duty job offered put his already-injured foot at risk because of his inability to wear safety shoes. McCord's rejection of the proffered job reflected a legitimate concern for his health and continuing medical needs and did not indicate his desire to strike. Therefore, substantial evidence supports the Board's conclusion that McCord was discharged in violation of § 8(a)(3). The Board's order reinstating McCord shall be enforced.

2.

The Board also determined that Pirelli had a discriminatory motive when it terminated Tinch, who was fired after he was found asleep on the job. Pirelli claims that it followed its usual course of business when it fired Tinch, and further argues that the record does not provide substantial proof of discriminatory animus. We agree that there is not substantial evidence supporting the Board's decision that Tinch was discriminatorily discharged and we reverse.

27

The Board applies a burden-shifting scheme to determine whether a discriminatory motive led an employer to discharge an employee in violation of NLRA § 8(a)(3). See NLRB v. CWI of Md., Inc., 127 F.3d 319, 330-31 (4th Cir. 1997). The General Counsel must prove by a preponderance of the evidence that the employer was motivated, at least in part, by anti-union discriminatory animus when it made its decision. See id. The General Counsel must demonstrate that the employee had been engaged in protected activity, that the employer knew of the activity, and that such activity was a substantial or motivating reason for the employer's action. See id. ; ARA Leisure Servs., Inc. v. NLRB, 782 F.2d 456, 462 (4th Cir. 1986); NLRB v. Daniel Construction Co., 731 F.2d 191, 193 (4th Cir.1984). Either direct or circumstantial evidence may be used. See NLRB v. Low Kit Mining Co., 3 F.3d 720, 728 (4th Cir. 1993).

If the General Counsel meets its burden of proving those elements by a preponderance of the evidence, the employer may overcome the unfair labor practice charge if it can show that the employee would have been fired even in the absence of union activity. See ARA Leisure Servs., Inc., 782 F.2d at 462. "Thus, an employer might show that a worker's deficiencies, economic necessity, or a legitimate business policy compelled the discharge." Id.

"When confronted with evidence of a legitimate business motive, General Counsel must prove by a preponderance of the evidence that union antipathy did actually play a part in the decision to discharge employees." NLRB v. Instrument Corp., 714 F.2d 324, 327 (4th Cir. 1983). In deciding what motivated the employer, the Board may not simply declare that the stated reasons for the discharge are pretextual, rather the General Counsel must put forth substantial evidence that anti-union animus motivated the decision to terminate. See id. at 327-28.

As proof that Tinch was the victim of discriminatory animus the Board relies upon the following: (1) Pirelli interviewed Tinch about his sleep apnea condition before assigning him to the night shift; (2) at that interview Pirelli asked him to sign a form indicating that his condition had improved; (3) Pirelli instructed Tinch's supervisors to report any problems to personnel; (4) Pirelli thereby treated him as a new hire on probation rather than as a long time worker; and (5) there

28

was a notation in the termination memorandum that Tinch had been absent from May 4, 1994, until September 26, 1995, due to the strike. Pirelli contends that the additional questioning was not at all strike-related but instead was undertaken out of a general concern that putting Tinch to work on the night shift would exacerbate Tinch's sleep apnea condition.

Even assuming that the aforementioned evidence is sufficient to prove by a preponderance of the evidence the General Counsel's initial burden that the discharge was motivated in part by anti-union discriminatory animus, which we doubt, we determine that on the basis of the record before us, Pirelli clearly met its burden of showing that it terminated Tinch for a legitimate non-pretextual business reason unrelated to his participation in the strike. He was terminated because his supervisor found him asleep during his shift. Although this was the first occasion after being recalled during which he was found asleep, he had been found sleeping on several other occasions during his tenure at Pirelli. Tinch himself testified that it was his supervisor at Pirelli who had first advised him to seek medical attention regarding sleeping on the job. His personnel file included many notations regarding his "sleeping problem." (J.A. at 835.) Additionally, Tinch testified that while employed at Pirelli prior to the strike he fell asleep on the job four or five times a night. (J.A. at 696.) Clearly, sleeping on the job is inappropriate behavior that has nothing to do with union activity. See Coates v. Johnson & Johnson, 756 F.2d 524, 552-53 (7th Cir. 1985) (determining that sleeping on duty is a nondiscriminatory reason for discharge); Thompson v. Leland Police Dept., 633 F.2d 1111, 1114 (5th Cir. 1980) (same). Therefore, Pirelli met its burden of proving that Tinch would have been terminated even in the absence of union activity.

Under the Board's burden shifting procedure, the General Counsel must put forth concrete evidence that Pirelli's explanation was pretextual. See Instrument Corp., 714 F.2d at 327-28. The Board's apparent conclusion that Pirelli's explanation was pretextual, is not supported by any evidence in the record. It is well-documented and unrebutted both that Tinch was asleep on the job when his supervisor found him and that he had a troubled work history at Pirelli prior to the strike. Consequently, we reverse the Board's determination that Tinch was

29

discriminatorily discharged in violation of § 8(a)(1) and (a)(3) of the NLRA.

V.

Based upon the foregoing discussion, we grant Pirelli's petition for review in part and deny it in part. We grant the Board's cross-petition for enforcement in part and deny it in part, and we remand for further consideration consistent with this opinion.

PETITION FOR REVIEW GRANTED IN PART
AND DENIED IN PART; CROSS-PETITION FOR
ENFORCEMENT GRANTED IN PART AND
DENIED IN PART; REMANDED